**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MAURICE CALDWELL, *Plaintiff-Appellant*, v. CITY AND COUNTY OF SAN FRANCISCO; SAN FRANCISCO POLICE DEPARTMENT; KITT CRENSHAW; ARTHUR GERRANS; JAMES CROWLEY, *Defendants-Appellees.* | No. 16-15473 DC No. 3:12-CV-01892-EDL OPINION |

Appeal from the United States District Court
for the Northern District of California
Elizabeth D. Laporte, Magistrate Judge, Presiding

Argued and Submitted October 13, 2017
San Francisco, California

Filed May 11, 2018

Before: A. Wallace Tashima and Jay S. Bybee, Circuit
Judges, and Matthew Frederick Leitman,[*] District Judge.

Opinion by Judge Tashima

---

[*] The Honorable Matthew Frederick Leitman, United States District Judge for the Eastern District of Michigan, sitting by designation.

## SUMMARY[**]

### Civil Rights

The panel affirmed in part and reversed in part the district court's summary judgment and remanded in an action brought pursuant to 42 U.S.C. § 1983 alleging that San Francisco Police Department officials fabricated evidence against plaintiff during his investigation for murder.

Plaintiff spent nearly twenty years in prison as a result of his murder conviction. He brought a § 1983 action after a state court granted his petition for writ of habeas corpus and ordered his release. Plaintiff alleged that a police sergeant deliberately manufactured a "show-up" by exposing him to a witness with the purpose of manipulating that witness into misidentifying plaintiff as the murder suspect. He further alleged that the sergeant deliberately fabricated a statement by plaintiff that placed plaintiff at the site of the shooting. Finally, plaintiff alleged that his interaction with police inspectors during a photo lineup were so coercive that they rose to the level of deliberate fabrication of evidence.

In reversing the district court's grant of summary judgment in favor of the police sergeant, the panel held that drawing all reasonable inferences in favor of plaintiff, he established that the sergeant had a motive to retaliate against him. He further raised a genuine issue as to whether the sergeant arranged the show up, deliberately fabricated the statement and memorialized it in falsified notes. The panel

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

held that plaintiff rebutted any presumption of prosecutorial independence and established a triable issue as to whether the allegedly fabricated identification and falsified statements caused him harm.

In affirming the district court's summary judgment as to the police inspectors, the panel held that their conduct during a photo line-up was not so coercive that it rose to the level of fabricated evidence.

## COUNSEL

Terry Gross (argued), Adam C. Belsky, and Monique Alonso, Gross Belsky Alonso LLP, San Francisco, California, for Plaintiff-Appellant.

Sean F. Connolly (argued) and Bradley A. Russi, Deputy City Attorneys; Cheryl Adams, Chief Trial Attorney; Dennis J. Herrera, City Attorney; Office of the City Attorney, San Francisco, California; for Defendants-Appellees.

## OPINION

TASHIMA, Circuit Judge:

## INTRODUCTION

Plaintiff-Appellant Maurice Caldwell spent nearly twenty years in prison for the 1990 murder of Judy Acosta. Upon release,[1] Caldwell sued San Francisco Police Department ("SFPD") officials Kitt Crenshaw, Arthur Gerrans, and James Crowley, under 42 U.S.C. § 1983, for allegedly fabricating evidence against him during the murder investigation.

As to Sergeant Crenshaw, Caldwell alleges that the officer deliberately manufactured a "show-up" with Caldwell at a witness' door. Specifically, Caldwell asserts that Crenshaw deliberately exposed Caldwell to a witness with the purpose of manipulating that witness into misidentifying Caldwell as the murder suspect. The alleged show-up, if it occurred, may have worked. Mary Cobbs, the witness in question, later picked Caldwell out of a photo lineup despite her initial description of the suspect being, in some regards, inconsistent with Caldwell's physical traits.

---

[1] On December 15, 2010 the Superior Court of California, County of San Francisco, granted Caldwell's petition for a writ of habeas corpus and ordered his release. Caldwell argued that he was entitled to the writ on the grounds of, among other things, ineffective assistance of counsel, actual innocence and that newly discovered evidence undermined the prosecution's case. The court held that Caldwell's trial attorney was ineffective on account of failing to investigate potential alibi and other eyewitnesses that supported Caldwell's arguments that he was not present and was not the shooter. The court did not rule on Caldwell's other grounds in support of his petition.

Regarding Inspectors Gerrans and Crowley, Caldwell alleges that their investigative techniques – mostly their interactions with Cobbs during the photo lineup – were so coercive that they rose to the level of deliberate fabrication of evidence.

The district court granted all of Defendants' motions for summary judgment, but for different reasons.  As to Crenshaw, the district court held that Caldwell had raised a triable issue as to whether the Sergeant fabricated evidence. The district court concluded, however, that the Sergeant was shielded from liability because the prosecutor's decision to charge Caldwell was subject to a presumption of independence and, therefore, broke the chain of causation between the alleged wrongdoing and Caldwell's harm.  As to Gerrans and Crowley, the district court held that Caldwell had not raised a triable issue as to whether either or both of them had deliberately fabricated evidence.

We hold that because Caldwell rebutted any presumption of prosecutorial independence, he established a triable issue as to whether Crenshaw fabricated evidence against him. Therefore, we reverse and remand as to Crenshaw.[2]  As to Gerrans and Crowley, we hold that their investigation techniques were not so coercive that they rose to the level of fabricated evidence.  Thus, we affirm as to Gerrans and Crowley.

---

[2] Caldwell also brought claims against the SFPD, and the City and County of San Francisco, under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), but the district court did not reach the issue.  The district court should address these claims on remand.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Acosta Murder and Caldwell's Conviction

On June 30, 1990, a group of four persons, including Judy Acosta and Domingo Bobila, went to a San Francisco housing project to buy drugs.  There, a group approached Acosta and Bobila, offering to sell crack.  The sale went wrong and one of the dealers pulled out a handgun and shot Acosta in the chest.  Bobila tried to flee in his car and a second man began firing a shotgun.  Bobila and Acosta were hit by shotgun fire and Acosta died in the car.  Caldwell claims that he was not present at the shooting; Defendants claimed that Caldwell was the shotgun shooter.

In March 1991, a jury convicted Caldwell of second-degree murder for shooting Acosta with the shotgun.  Mary Cobbs testified at trial and identified Caldwell as the shotgun shooter.[3]  A few months afterwards Cobbs and her children received roundtrip tickets to Disneyland from the San Francisco Secret Witness Program.

### B.  The July 13, 1990 Canvass

On July 13, 1990, Inspector Gerrans, Sergeant Crenshaw, and Officer Robert Doss of the SFPD canvassed the housing project where the Acosta murder occurred.  The general purpose of the canvass was to, among other things, find witnesses to the murder.  The day before, the police had received an anonymous tip that the police should "check out" Caldwell, "who had been shooting off guns in the projects . . .

---

[3] Cobbs passed away in 1998.

for years." During the canvass, Gerrans mentioned the name Caldwell to Crenshaw and Crenshaw said he knew him.

Caldwell and Crenshaw had history. Caldwell had interacted with Crenshaw between six and nine times prior to the 1990 murder investigation. During these stops Caldwell said that Crenshaw would tell him things such as,"[h]e [sic] going to catch me, and when he do catch me, he going to end up killing me or he going to have me in jail for the rest of my life, you know." Five months before the murder, Caldwell filed a complaint with the Office of Citizen Complaints ("OCC")[4] against Crenshaw. During the OCC's investigation, Crenshaw admitted telling Caldwell:

> One day I'm going to be sitting up there and you're going to be blown away. Something's going to happen to you because sooner or later I'm going to catch you with a gun and you and I are going to have it out. I'm going to kill you. Next time we're going to get the drop on you.

Gerrans later testified that had he known about Crenshaw and Caldwell's history, he may have had second thoughts about Crenshaw being involved in the investigation.

---

[4] According to the City and County of San Francisco's government website, "[t]he OCC was the civilian oversight department for the San Francisco Police Department . . . . The OCC investigated complaints of misconduct and neglect of duty by police officers, could file disciplinary charges against officers, and make policy recommendations." *See* DEP'T OF POLICE ACCOUNTABILITY, *New! The OCC is now the Department of Police Accountability*, SFGOV (Feb. 7, 2017), http://sfgov.org/dpa/news-release/new-occ-now-department-police-accountability.

Gerrans met Cobbs during the course of the canvass. Cobbs had witnessed the shooting and agreed to an interview with Gerrans. During the interview, Cobbs stated that the shooters did not live around her, but that she recognized them from seeing them in the area a few times. Cobbs said she did not know the shooters' names or nicknames. Cobbs gave a description of the shotgun shooter as a 5'4", 150-pound, African-American man that wore his hair in a jheri curl. Caldwell had an apartment next door to Cobbs' and may have lived there.

### 1.  The Alleged Show-up at Cobbs' Door

During the July 13, 1990, canvass, Crenshaw saw Caldwell on the street and approached him. In Caldwell's retelling, Crenshaw knew that Gerrans was interviewing a potential witness and marched Caldwell to Cobbs' door. At the door Crenshaw knocked, Cobbs answered, and Crenshaw asked if the homicide inspector was there. Caldwell and Cobbs made eye contact. According to Caldwell, once Gerrans came to the door, Crenshaw stated "this is Maurice Caldwell, or Twone, right here. And can I have your keys?" Crenshaw asked for Gerrans' keys despite having his own car nearby. Andrena Gray, Caldwell's girlfriend at the time, corroborated Caldwell's story in a later-filed declaration, stating Crenshaw "forcibly walked [Caldwell] down the street, and stopped in front of the door of an apartment, which I later learned was the apartment of Mary Cobbs."

Caldwell alleges that Crenshaw manufactured this show-up to manipulate Cobbs into falsely identifying Caldwell as the shooter. Defendants do not dispute that Crenshaw knocked on Cobbs' door while Gerrans was interviewing the

witness, but they all contend that Caldwell was not with Crenshaw at the door.

### 2. The Conversations between Caldwell and Crenshaw

Caldwell and Crenshaw spoke to one another two different times during the canvass.  The men tell different stories.  First, Crenshaw confronted Caldwell in the street.  It was during this encounter on the street that, according to Crenshaw, Caldwell made a "spontaneous statement" about being present at the shooting and dealing drugs.  The second encounter between Crenshaw and Caldwell took place in Gerrans' car and Crenshaw told Caldwell that homicide wanted to talk to him.

According to Caldwell, on the street, he asked Crenshaw, "why do you harass me?"[5]  In the car, Crenshaw asked "what do you know about a murder?" and Caldwell responded, "I don't know nothing about nothing."  Crenshaw then allegedly asked Caldwell where he was the night of the murder and Caldwell replied that he was at his uncle's house.  From these encounters, Crenshaw later wrote the following notes:

> Maurice Caldwell stated that he was present at the shooting, but he was down the street. Prior to the shooting. Caldwell was with the suspects dealing drugs. After the shooting Caldwell returned and started yelling at the shooters, he did this because he felt he was going to be blamed. He further stated he knew

---

[5] Gray also filed a declaration that she witnessed the first interaction on the street and corroborates Caldwell's version.

> why I stopped him, because 'anytime somebody does any shooting it's usually me.' 'But that was before, I don't do that any more [sic].'

Caldwell denies having said any of this and alleges that Crenshaw fabricated the statement and falsified the notes.

## C. The July 26, 1990 Photo Lineup

On July 25, 1990, Cobbs tried to cancel a scheduled photo lineup, stating that she had been threatened for cooperating with the police. Gerrans convinced Cobbs to come in regardless.

On July 26, 1990, Cobbs met with Gerrans and Crowley. Gerrans and Crowley then performed a non-videotaped photo lineup. Recording a photo lineup would have been the department's "number one choice" in 1990, but there is no evidence that it was required by policy. After Cobbs apparently picked Caldwell out of the photo lineup as the shotgun shooter, the officers turned on a camera and conducted the photo lineup again. Once the camera was rolling, Cobbs picked Caldwell again and said that she had heard that people call him, "Twan."

After the photo lineup, the officers asked Cobbs to recount what she saw the night of the shooting. During Cobbs' retelling, the officers interjected with statements, such as "this is the man you saw out front of your house the night of the shooting and he had a shotgun. Is that correct?" Later, the officers asked, "[t]he man that you saw, you picked out in this picture here, the man with the shotgun, he was still shooting the shotgun as the car was leaving?" Finally, the

officers referenced Caldwell by name: "When you went to the window, you recognized this man and I'm turning over the picture of Maurice Caldwell SF No. 445392. That's the man that you recognized. 'Cuz you saw him in the area before, right?"

The officers also discussed that people had threatened Cobbs for cooperating with the police. During Gerrans' deposition, Caldwell's attorney asked, "Did you say to [Cobbs] . . . [that] the police department would take efforts to protect her [from threats] if she was able to help you in ID'ing this person as a suspect?" To which Gerrans replied, "I believe that was said." Gerrans continued "we didn't go into witness . . . relocation or anything like that. We didn't promise her anything at that time. We promised we would take care of her to protect her."

## D. The Prosecutor's Actions

Assistant District Attorney, Alfred Giannini, prosecuted Caldwell. In support of Defendants' motion for summary judgment, Giannini filed a declaration describing his investigation in the case. Giannini declared that he authorized charges against Caldwell on September 20, 1990, after reviewing all the evidence available to him. Before the preliminary hearing on December 3, 1990, Giannini interviewed a number of witnesses and did not believe they had been coached. At the preliminary hearing, in response to Caldwell's attorney's questioning of Cobbs, Giannini considered, for the first time, whether Cobbs had seen Caldwell during the alleged show-up, but "determined that Ms. Cobbs had not seen Mr. Caldwell, and . . . decided that even if she had, it hadn't undermined the reliability or veracity of her testimony." Giannini further stated, that

although he did not elicit any evidence about Caldwell's July 13, 1990, statement at trial, he initially considered the "inconsistency" between that statement and Caldwell's September 21, 1990, statement, but "decided it was a minor factor when reviewing the totality of the evidence."

## E.  The District Court's Opinion

As to Gerrans and Crowley, the district court held that Caldwell had not raised a triable issue on whether either or both of them had deliberately fabricated evidence against Caldwell.  As to Crenshaw, the court held that Caldwell had raised a triable issue whether Crenshaw had (1) manufactured the alleged show-up to manipulate Cobbs into identifying Caldwell, and (2) deliberately fabricated a statement by Caldwell, which placed Caldwell at the site of the shooting. The court stated:

> [Caldwell] has come forth with evidence that Crenshaw was hostile to [Caldwell] and threatened to catch him, get "the drop" on him and kill him.  Additionally, Crenshaw knew that Caldwell was a suspect, knew that Gerrans was inside a home talking to someone who might possibly be a witness, and allegedly brought [Caldwell] to that person's door.  It is undisputed that Mary Cobb's identification of [Caldwell] was a critical component in the state's case against [Caldwell].  Moreover, although Crenshaw's notes were not introduced at trial, Plaintiff plausibly argues that the investigation continued to focus on him, at least in part, as a result of Crenshaw's false report.

Nonetheless, the district court still granted summary judgment to Crenshaw on the basis that Giannini's presumptively independent decision to charge and prosecute Caldwell broke the chain of causation between the fabricated evidence and Caldwell's injury.

## II.  STANDARD OF REVIEW

This court reviews a grant of summary judgment *de novo*. *See Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) (en banc).  "Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law."  *Id.* (citing *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc)).

## III.  ANALYSIS

"[T]here is a clearly established constitutional due process right not to be subject to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Id.* at 1074–75.  A plaintiff can prove deliberate fabrication in several ways.  Most basically, a plaintiff can produce direct evidence of deliberate fabrication.  *See Spencer v. Peters*, 857 F.3d 789, 793 (9th Cir. 2017) (citing *Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1111 (9th Cir. 2010)).  Alternatively, a plaintiff can produce circumstantial evidence related to a defendant's motive.  *Devereaux*, 263 F.3d at 1076.  *Devereaux* noted that to prove a fabrication claim using circumstantial evidence, a plaintiff must:

> support[] at least one of the following two
> propositions: (1) [d]efendants continued their
> investigation . . . despite the fact that they
> knew or should have known that [the plaintiff]
> was innocent; or (2) [d]efendants used
> investigative techniques that were so coercive
> and abusive that they knew or should have
> known that those techniques would yield false
> information.

*Id.*

## A.  Sergeant Crenshaw

As an initial matter, Caldwell is supporting his claims against Crenshaw with direct evidence of fabrication.

### 1.  Fabrication

Caldwell contends that Crenshaw fabricated evidence against him by (1) manufacturing a show-up with Caldwell at Cobbs' door to manipulate her into identifying Caldwell as the shooter, and (2) fabricating a statement from Caldwell by falsifying notes of a conversation between the officer and the suspect.  Caldwell suggests that Crenshaw fabricated this evidence because he was out to get Caldwell after Caldwell reported the officer to the OCC for alleged abuses.  In the light most favorable to the non-moving party, Caldwell has raised a triable issue as to whether Crenshaw deliberately fabricated this evidence.

First, Caldwell presents evidence suggesting that Crenshaw had a motive to target him during the 1990 investigation.  Crenshaw had stopped Caldwell between six

and nine times prior to the 1990 murder investigation. During these stops Caldwell said that Crenshaw would threaten to kill him or throw him in jail for life. Additionally, five months before the murder, Caldwell filed a complaint with the OCC against Crenshaw as to which Crenshaw admitted that he had threatened Caldwell. While Defendants are correct that retaliatory motive is not an element of a fabrication of evidence claim, these facts, taken in the light most favorable to Caldwell, support the inference that Crenshaw fabricated evidence.

### a.  The Alleged Show-up

The district court correctly held that Caldwell raised a triable issue as to whether Crenshaw fabricated evidence by showing-up at Cobbs' door with Caldwell. To put it simply, there is clearly a dispute of fact about whether this show-up occurred. For one, Defendants concede that there are at least four "versions" of the alleged show-up at Cobbs' door. In Caldwell's version, Crenshaw detained Caldwell during the July 13, 1990 canvass and marched him to Cobbs' apartment, where Caldwell made eye contact with the witness.[6] According to Caldwell, once Gerrans came to the door Crenshaw stated "this is Maurice Caldwell, or Twone, right here. And can I have your keys?" Crenshaw asked for Gerrans' keys despite having his own car in the neighborhood. Defendants dispute that Caldwell was with Crenshaw at Cobbs' door.

Nevertheless, there is support for Caldwell's version of events. Cobbs' initial description of the shooter is

---

[6] Gray corroborates Caldwell's version of the events, thus strengthening our conclusion that there is a triable issue for the jury.

inconsistent with her later selection of Caldwell in the photo lineup. First, Cobbs' description of the shooter as a 5'4", 150-pound, African-American man with a jheri curl hairstyle is a fairly accurate description of Caldwell, but not exact. Crenshaw described Caldwell as 5'5" and 125-pounds. More importantly, Cobbs first stated that the shooters did not live in the neighborhood and that she did not know their names or nicknames. However, there is evidence in the record that Caldwell was Cobbs' neighbor and Cobbs later stated she had heard that people called Caldwell "Twan." Taking these facts in the light most favorable to Caldwell, the inference is that Cobbs would have initially told Gerrans that she recognized the shooter as her neighbor if she thought that Caldwell was the shooter. The fact that Cobbs only later identified Caldwell and his nickname supports the inference that the show-up occurred and influenced her initial recollection of the shooting.

There is also a triable issue as to whether Crenshaw brought Caldwell to Cobbs' front door for the purpose of fabricating evidence against Caldwell. Citing, *Perry v. New Hampshire*, 565 U.S. 228 (2012), Defendants argue that the show-up did not implicate Caldwell's due process rights because the facts do not support the notion that it was a police-arranged. Specifically, Defendants contend that Crenshaw could not have arranged the show-up because he did not know that Cobbs was a witness. Defendants' argument is not convincing.

First, *Perry* is distinguishable in that the defendant conceded that "law enforcement officials did not arrange the suggestive circumstances surrounding [the witness'] identification." *Id.* at 240. Second, in contrast to *Perry*, here there is evidence that Crenshaw purposely put Caldwell in

front of Cobbs to infect her recollection and suggest Caldwell as the shooter.  Drawing all reasonable inferences in favor of Caldwell, he established first, that Crenshaw had a motive to retaliate against him for reporting the officer to the OCC. Further, Crenshaw generally understood the purpose of the canvass to be looking for witnesses and evidence, and it is reasonable to infer that Crenshaw knew Gerrans was interviewing Cobbs as a witness.  Finally, Caldwell presented evidence that Crenshaw asked for Gerrans' car keys as a pretext for the show-up even though Crenshaw had his own car in the neighborhood.    Taken together, Caldwell establishes a genuine issue as to whether Crenshaw arranged the show-up.

### b.  The Allegedly Fabricated Statement

There is also a triable issue as to whether Crenshaw deliberately fabricated a statement from Caldwell and memorialized it in falsified notes.  According to Caldwell, Crenshaw first confronted Caldwell in the street and, as witnessed by Gray, all Caldwell said was something to the effect of "why are you harassing me?"  After the show-up, Crenshaw brought Caldwell to Gerrans' car.  In the car, Crenshaw asked "what do you know about a murder?" and Caldwell responded, "I don't know nothing about nothing." Crenshaw allegedly asked Caldwell where he was the night of the murder and Caldwell replied that he was at his uncle's house.

Crenshaw had a different view of the conversations. Crenshaw later memorialized his version of the interactions in a report.  According to Crenshaw, Caldwell made a "spontaneous statement" on the street about being present at the shooting and dealing drugs.  The report also claimed that

Caldwell stated he returned to the scene after the shooting to yell at the shooters.

Clearly there is a triable dispute about whether Caldwell actually made the statements attributed to him by Crenshaw. Further, the discrepancy between Caldwell and Crenshaw's accounts of their conversations is the type of direct evidence of fabrication that was at issue in *Costanich*. In *Costanich*, the court found evidence of intentional fabrication sufficient to survive summary judgment where "witnesses pointed out that the [investigation] report contained evidence or statements they never made." *Costanich*, 627 F.3d at 1112. Here, Caldwell stated in his deposition that "[t]he only thing correct in [the disputed statement] is my name."

Defendants counter that the discrepancies between the accounts do not rise to the level of fabrication and are "[a]t the very worst . . . careless or inaccurate." As support, Defendants cite *Gausvik v. Perez*, which held that an affidavit for probable cause that contained errors was not sufficient to establish deliberate fabrication of evidence. 345 F.3d 813, 817 (9th Cir. 2003). The affidavit in *Gausvik* stated that three children had tested "positive" for sexual abuse when really the tests were only "suggestive" or "consistent" with abuse. *Id.* Further, the affidavit stated that eight children had accused the suspect, when only two had, but one of them told the officer that the suspect had abused at least eight other children. *Id.* The court chalked these errors up the officer being careless with the facts, but that the errors did not rise to the level of deliberate fabrication. *Id.*; *Costanich*, 627 F.3d at 1112 (not every "recording error[] and misstatement[]" in an investigative record rises to the level of constitutional violation).

Defendants cherry pick facts from Caldwell's statements to attempt to portray the discrepancies in Crenshaw's notes as careless errors like those in *Gausvik*. For example, Caldwell said that he told Crenshaw that he was at his uncle's house, which is "down the street" from the shooting. Defendants also contend that, because Caldwell *later* testified that he went to the scene after the shooting, there is no inconsistency with Crenshaw's note. These arguments are unsupported by the record.

What Defendants fail to mention is that Caldwell never admitted that he was with the drug dealers, dealing drugs, or that "anytime somebody does any shooting it's usually me." There is a wide gulf between telling someone you were at your uncle's house nearby when a shooting occurred and telling someone you were "present" for a shooting and were "with the suspects dealing drugs." We conclude that the potential "errors" are not obviously the product of carelessness and that there is a triable issue as to whether Crenshaw intentionally fabricated his notes.

### 2.  Causation

Our inquiry, however, does not end with the conclusion that Caldwell has raised triable issues on whether Crenshaw deliberately fabricated evidence. Caldwell must still come forward with a showing that the fabrication caused him some harm.

"To prevail on a § 1983 claim of deliberate fabrication, a plaintiff must prove that (1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty." *Spencer*, 857 F.3d at 798 (citing *Costanich*, 627 F.3d at

1111).  To establish causation, Caldwell must raise a triable issue that the fabricated evidence was the cause in fact and proximate cause of his injury.  *See id*.  Like in any proximate cause analysis, an intervening event may break the chain of causation between the allegedly wrongful act and the plaintiff's injury.  *See Beck v. City of Upland*, 527 F.3d 853, 862 (9th Cir. 2008) (citing RESTATEMENT (SECOND) OF TORTS §§ 440 *et seq.*).

As to what constitutes an injury, a § 1983 plaintiff need not be convicted on the basis of the fabricated evidence to have suffered a deprivation of liberty – being criminally charged is enough.  *See Devereaux*, 263 F.3d at 1074–75 ("[T]here is a clearly established constitutional due process right *not to be subjected to criminal charges* on the basis of false evidence that was deliberately fabricated by the government." (emphasis added)); *cf.* NINTH CIR. JURY INSTR. COMM., MANUAL OF MODEL CIVIL JURY INSTRUCTIONS, § 9.33 (2017) ("The defendant [*name*] deliberately fabricated evidence that was used to [[criminally charge] [prosecute] [convict]] the plaintiff." (brackets in original)).

### a.  Rebuttable Presumption of Prosecutorial Independent Judgment

Typically, in constitutional tort cases the "[f]iling of a criminal complaint immunizes investigating officers . . . because it is presumed that the prosecutor filing the complaint exercised independent judgment in determining that probable cause for an accused's arrest exists at that time."  *Smiddy v. Varney*, 665 F.2d 261, 266 (9th Cir. 1981) ("*Smiddy I*"), *overruled on other grounds by Beck*, 527 F.3d at 865.  The district court held, and Defendants argue here, that the *Smiddy* presumption breaks the chain of causation between

Crenshaw's alleged fabrication of evidence and the harm that Caldwell suffered in being criminally charged.    Thus, Defendants contend, Crenshaw is immunized from § 1983 liability.

Conversely, Caldwell contends that prosecutorial independence only severs the causal chain where the underlying civil rights violation is based on a lack of probable cause.    And that because deliberate fabrication of evidence cases are not dependent on finding a lack of probable cause, no presumption should be at play.  *See Spencer*, 857 F.3d at 801 (rejecting the contention that a plaintiff must "prove that, setting aside the fabricated evidence, probable cause was lacking"); *see also Halsey v. Pfeiffer*, 750 F.3d 273, 292–93 (3d Cir. 2014) (even where probable cause exists, "we believe that no sensible concept of ordered liberty is consistent with law enforcement cooking up its own evidence").  To support his argument that the presumption does not extend to deliberate fabrication cases, Caldwell highlights that the underlying violation in *Smiddy I* was false arrest and that the Court emphasized that the prosecutor made its "independent judgment decision *in determining that probable cause . . . exist[ed] . . . .*" *Smiddy I*, 665 F.2d at 266 (emphasis added).[7]

---

[7] Caldwell also argues that this Court has never applied the presumption in a fabrication of evidence case and cites a string of cases where this Court applied the *Smiddy* presumption in false arrest or malicious prosecution cases – claims that require a lack of probable cause. *See, e.g.*, *Harper v. City of L.A.*, 533 F.3d 1010, 1027 (9th Cir. 2008); *Newman v. Cty. of Orange*, 457 F.3d 991, 993 (9th Cir. 2006)). Defendants respond that this Court did just that in *McSherry v. City of Long Beach*, 584 F.3d 1129 (9th Cir. 2009).  But *McSherry* is unclear on this point.  It is true that *McSherry* involved a deliberate fabrication of evidence claim and that this Court held that the allegedly fabricated evidence did not influence the prosecutor's independent decision. *Id.* at

Alternatively, Caldwell argues that even if the presumption applies, he sufficiently rebutted it.

While we recognize that both sides make reasonable arguments as to the applicability of the causation-breaking presumption in fabrication of evidence cases, we need not resolve the parties' debate. Assuming without deciding that the presumption applies to such claims, we hold that Caldwell sufficiently rebutted any presumption and has established a triable issue as to causation.

### b. Presumption Rebutted

Deliberately fabricated evidence in a prosecutor's file can rebut any presumption of prosecutorial independence. In *Smiddy I*, this Court gave a few non-exclusive examples of how a plaintiff might overcome the presumption, including by showing that the officers presented the district attorney with "information known by them to be false." 665 F.2d at 266–67. A plaintiff can also rebut the presumption by presenting evidence "that the officers knowingly withheld relevant information" from the prosecutor. *See Smiddy v. Varney*, 803 F.2d 1469, 1471 (9th Cir. 1986) ("*Smiddy II*"). In sum, if a plaintiff establishes that officers either presented

---

1137. However, there is no discussion of a presumption of independence that automatically precludes a finding of causation. Instead, the Court held that McSherry had not presented sufficient evidence of causation. *See id.* at 1142 ("[E]ven examining the evidence in the light most favorable to McSherry, the evidence presented before the district court was simply insufficient to sustain a finding that [the prosecutor's] investigation and decision making was not independent and was tainted by the alleged fabrication of evidence.") Thus, the *McSherry* court engaged in a normal causation analysis at the summary judgment stage, without reference to any presumption.

false evidence to or withheld crucial information from the prosecutor, the plaintiff overcomes the presumption of prosecutorial independence and the analysis reverts back to a normal causation question.

As stated above, we hold that Caldwell presents "more than conclusory allegations of the falsehood" of (1) Cobbs' identification of him, and (2) Crenshaw's notes. *See Blankenhorn v. City of Orange*, 485 F.3d 463, 483 (9th Cir. 2007). Further, Caldwell raises a triable issue as to whether Giannini relied on these alleged falsehoods in his decision to charge Caldwell. *See id.* Thus, Caldwell has rebutted any presumption of prosecutorial independent judgment and has established a triable issue as to causation.

First, the allegedly fabricated identification was part of the evidentiary record that Giannini reviewed prior to authorizing charges against Caldwell. And there is no dispute that Cobbs' identification was a crucial piece of evidence against Caldwell. Further, Giannini himself admitted that the preliminary hearing on December 3, 1990, was the first occasion that he "considered the possibility that Ms. Cobbs had seen Caldwell during her interview with Inspector Gerrans.]" It therefore follows that Giannini did not consider whether the alleged show-up had taken place until more than two months after he had authorized charges against Caldwell.[8] A prosecutor's judgment cannot be said to be

---

[8] Giannini continues, "I determined that Ms. Cobbs had not seen Mr. Caldwell, and I decided that even if she had, it hadn't undermined the reliability or veracity of her testimony." We take no position on whether the causal chain was broken after Giannini first learned of and considered the alleged fabrication on December 3, 1990. We hold only that Caldwell sufficiently rebuts any presumption of independence in Giannini's

independent where the prosecutor considers potentially fabricated evidence without knowing that the evidence might be fundamentally compromised and misleading.[9] Therefore, this falsified identification may have infected Giannini's review of the evidence and rebuts any presumption that his September 20, 1990, decision to charge was independent. *See Blankenhorn*, 485 F.3d at 483 (plaintiff rebutted presumption of prosecutorial independence where, at the time of charging, the prosecutor only considered police reports and not contradictory evidence that showed the reports might contain fabricated evidence).

Second, the allegedly falsified notes were likewise part of the evidentiary record that Giannini reviewed in deciding to charge Caldwell.[10]   Giannini declared, "[a]lthough I initially

---

September 20, 1990, charging decision and that Caldwell raises a triable issue on causation.  A jury will need to consider these causation questions.

[9] Defendants argue that *McSherry* stands for the premise that the existence of fabricated evidence in a prosecutor's file does not rebut the presumption of independent judgment.  However, the officer in *McSherry* allegedly fabricated some of the evidence *after* the prosecutor's initial decision to charge.  *See McSherry*, 584 F.3d at 1133, 1136, 1142.  Thus, the allegedly fabricated evidence could not have affected the prosecutor's decision to charge.

[10] The district court rejected Caldwell's rebuttal arguments on this point by concluding that Gray's declaration did not corroborate Caldwell's story about the falsified statements and that, therefore, Caldwell only supported his contention with his own testimony.  *See Newman*, 457 F.3d at 995 ("To rebut the presumption of independent judgment and to survive summary judgment on a malicious prosecution claim, a plaintiff must provide more than an account of the incident in question that conflicts with the account of the officers involved.").

considered the inconsistency between [the July 13, 1990] statement and Caldwell's recorded statement of September 21, 1990, during the course of the prosecution, I decided it was a minor factor when reviewing the totality of the evidence."

Again we hold that Giannini's consideration of potentially fabricated evidence rebuts any presumption of independent judgment and creates a factual issue for the jury. For one, reading the prosecutor's statement in the light most favorable to Caldwell, a jury could conclude that "considering the inconsistency" did not mean that the prosecutor knew that the statement was allegedly fabricated. Further, even though Giannini decided "during the course of the prosecution" that the inconsistency was a "minor factor," a jury could reasonably conclude that the prosecutor relied on the falsified statement in deciding to charge Caldwell. As such, we conclude that Caldwell raises a triable issue as to causation for both the allegedly fabricated identification and allegedly falsified statements, even if the presumption of prosecutorial independent judgment extends to deliberate fabrication of evidence claims.

---

We disagree. The district court reasoned that because Gray could not have heard Caldwell's and Crenshaw's conversation inside the police car, she did not have personal knowledge of the statements at issue. However, Crenshaw himself testified that Caldwell's "spontaneous statement" about being present at the shooting and dealing drugs occurred during their first interaction on the street. As such, Gray's declaration corroborates Caldwell's claim that he did not say anything about the shooting to Crenshaw. Therefore, Caldwell may use Gray's declaration to rebut any presumption of prosecutorial independence.

## B. Inspectors Gerrans and Crowley

Unlike in regards to Crenshaw, Caldwell does not contend that he has direct evidence that Gerrans and/or Crowley deliberately fabricated evidence during the investigation. Instead, Caldwell relies on the second prong of *Devereaux* to bring his claims. Therefore, he must establish that there is a triable issue as to whether "[d]efendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information." *Devereaux*, 263 F.3d at 1076. Caldwell has not met this burden.

Caldwell attacks Gerrans' and Crowley's investigative actions in a number of ways, most of which relate to their conduct during the July 26, 1990, photo lineup in which Cobbs identified Caldwell as the shooter. Essentially, Caldwell's theory is that Cobbs' initial statement on July 13 ruled out Caldwell as the shooter,[11] so that her later identification of Caldwell constituted a change that *must have been* the result of improper coercion during the July 26 photo lineup. Specifically, Caldwell contends that Gerrans and Crowley intentionally did not record the initial portion of the July 26 meeting with Cobbs to cover up their use of the improperly suggestive techniques. The techniques that Caldwell alleges were coercive include: (1) telling Cobbs

---

[11] We disagree that Cobbs' statements to Gerrans during the canvass ruled out Caldwell as the shooter. As already touched upon, her physical description of the shooter is not exact as to Caldwell, but is not totally inconsistent either. Further, even though Cobbs said the shooters did not live in the area, there is uncertainty about whether Caldwell actually lived in the apartment next door. Finally, even if Cobbs knew Caldwell's nickname two weeks after the initial interview, this is not conclusive evidence that she knew his moniker during the canvass.

that the "suspect" was in the lineup, (2) "reinforcing" her identification of Caldwell, and (3) offering her protection or financial benefits conditioned upon her picking a suspect out of the lineup or testifying against the suspect.  Even considering the facts in the light most favorable to Caldwell, there is no triable issue that Gerrans and Crowley used these investigative techniques or that the techniques were so coercive or abusive that they rose to the level of intentionally fabricated evidence.

As a preliminary matter, Caldwell is not contending that Gerrans' and Crowley's failure to videotape the initial exchanges with Cobbs during the July 26 photo lineup is, by itself, a constitutional violation.  Instead, Caldwell references the decision not to videotape to imply that Gerrans and Crowley must have coached Cobbs during the unrecorded portion of the lineup.  Without any evidence that coaching actually occurred during this time, it is not reasonable to draw Caldwell's requested inference.  Regardless, Caldwell also takes issue with some of the inspectors' techniques during the recorded portion of the photo lineup.

### 1.   Telling Cobbs that a Suspect was in the Lineup

First, Caldwell asserts that the officers told Cobbs that "the suspect" was in the photo lineup they presented to her. Caldwell's only evidence for this is that, the day after the meeting with Cobbs, the officers allegedly told *a different witness*, Bobila, that there was a suspect in the photo lineup. To support this, Caldwell cites to the following from Bobila's deposition:

> [M]y recollection, [the officers] just asked me
> if I could recognize any of these six pictures

that was put in front of me. Like I said, they pick up a suspect that they think is a suspect, and it's going to be six pictures that's similar to the one they arrested, and I pick up the picture because I thought that he looks familiar.

Even reading this statement in the light most favorable to Plaintiff, it says nothing about Gerrans and Crowley telling Bobila that a suspect was in the lineup. At best, this shows that Bobila's understanding was that a suspect was in the lineup, but not how he came to have that understanding. Further, even if the officers had told a different witness that there was a subject in the lineup, it would likely not be enough to raise a triable issue as to whether Gerrans and Crowley also told Cobbs that a suspect was in her photo lineup.

### 2.   "Reinforcing" Cobbs' Selection of Caldwell

Second, Caldwell argues that Gerrans and Crowley improperly "reinforced" Cobbs' identification of Caldwell in the photo lineup "no less than eight times." At first, the officers tried to confirm whether the person she selected was the shotgun shooter: "this is the man you saw out front of your house the night of the shooting and he had a shotgun. Is that correct?"Later, the officers asked, "[t]he man that you saw, you picked out in this picture here, the man with the shotgun, he was still shooting the shotgun as the car was leaving?" Finally, the officers referenced Caldwell by name: "[w]hen you went to the window, you recognized this man and I'm turning over the picture of Maurice Caldwell SF No. 445392. That's the man that you recognized. 'Cuz you saw him in the area before, right?'"

The officers never actually confirmed that Cobbs picked the correct "suspect," apart from, possibly, stating Caldwell's name, which only came towards the end of the discussion. This is different than directly confirming that a witness picked the correct suspect. Further, one of the cases Caldwell cites in support of his assertion, *Oliva v. Hedgpeth*, 375 F. App'x 697 (9th Cir. 2010) (unpublished), is both non-precedential and distinguishable. Here there is no allegation that Cobbs picked another photo out of the lineup before selecting Caldwell; no indication that Cobbs thought that she was required to select a photo from the lineup. *See id.* At 698. We do not believe that any "reinforcing" in this case was so coercive or abusive that it was likely to lead to a false identification.

### 3.  Conditioning Benefits on Testifying against Caldwell

Third, Caldwell alleges that the officers manipulated Cobbs' identification by offering her incentives to testify. The alleged incentives came in the form of a promise to relocate her – conditioned on picking a witness – and financial benefits under SFPD's Secret Witness Program.

As to the promise to relocate Cobbs, Caldwell alleges that this was impermissibly suggestive because a jury could conclude that the offer of protection was only on the table if she picked a suspect out of the photo lineup. During Gerrans' deposition, Caldwell's attorney asked the officer whether they offered to protect Cobbs if she identified a suspect. To which Gerrans replied, "I believe that was said." Gerrans continued "we didn't go into witness . . . relocation or anything like that . . . . We didn't promise her anything at that time. We promised we would take care of her to protect her."

This evidence might create a triable issue about whether Gerrans and Crowley conditioned the offer to protect Cobbs on identifying a suspect – even if Gerrans did not promise anything to Cobbs, he still agreed with Caldwell's attorney that he said the "police would take efforts to protect [Cobbs] *if*" she identified a suspect.  Nonetheless, even if there is a factual dispute as to whether the officer conditioned protection on Cobbs testifying, any conditioning in this case is not so coercive as to lead to fabricated evidence.

For example, while paying a witness for testimony may create adverse incentives to provide false statements, paying a witness alone does not violate due process.  *See United States v. Cuellar*, 96 F.3d 1179, 1182 (9th Cir. 1996) ("We, and other courts as well, have consistently held that the government is not precluded from using [paid] informants before or during trial simply because an informant may have a motive to falsify testimony . . . ."); *cf. United States v. McQuin*, 612 F.2d 1193, 1195 (9th Cir. 1980) (witness "assured payment by the FBI only if there were an arrest and he testified").  If directly paying a witness does not violate a defendant's due process, offering Cobbs protection if she testified is not so coercive that it would lead to false testimony.  A defendant facing a paid or motivated witness can raise those issues during cross-examination.

Finally, Caldwell makes a similar argument that, because Cobbs received a trip to Disneyland six months after Caldwell's conviction, Crowley and Gerrans must have promised Cobbs financial benefits.  In support of this theory, Caldwell identifies a letter from United Airlines awarding Cobbs three round trip tickets to Orange County "in support of the Secret Witness Program."  However, there is no

evidence linking Crowley or Gerrans to the Secret Witness Program.  There is no suggestion of coercion here.

Accordingly, we hold that Gerrans' and Crowley's investigative techniques were not so "coercive and abusive that [the officers] knew or should have known that [they] would yield false information."  *Devereaux*, 263 F.3d at 1076.  As such, we affirm summary judgment in favor of Gerrans and Crowley.

## IV.  CONCLUSION

For the foregoing reasons we affirm the grant of summary judgment as to Inspectors Gerrans and Crowley, but reverse and remand as to Sergeant Crenshaw.  Each party shall bear his own costs on appeal.

**AFFIRMED in part, REVERSED in part, and REMANDED.**