Ross, J.**
*82 *181 Appellant Maurice Caldwell's 1991 second degree murder conviction was reversed when the trial court granted his habeas corpus petition. Caldwell's habeas petition alleged various grounds for relief-including the actual innocence claim at issue here-but the sole basis for *182 granting the petition was the ineffective assistance of his trial counsel. Caldwell filed a subsequent Penal Code section 1485.55[1] motion for a finding of factual innocence (factual innocence motion), which the trial court denied. Caldwell appeals. The People contend that the order is not appealable. We hold that the order is appealable, review the record de novo and affirm the trial court's decision.
FACTUAL AND PROCEDURAL BACKGROUND
A. The murder and investigation
On June 30, 1990, at approximately 2:30 a.m., Judy Acosta was murdered, and his friend, Domingo Bobila, was injured when they were shot during a drug deal in the Alemany Housing Project in San Francisco. Acosta and Bobila drove to the 900 block of Ellsworth Street with their friends Eric Aguirre and Dominador Viray. Having spent the evening drinking beer, the men decided to buy crack cocaine in the Alemany projects, an area known for drug sales and violent crime. During the drug buy, a drug seller punched Bobila in the face. Marritte Funches then shot Acosta several times in the chest at close range with a handgun. The People presented evidence-which Caldwell disputes-that Caldwell arrived and fired a shotgun at Acosta and Bobila. As they were hit by the shotgun pellets, Bobila pulled Acosta into the car and drove to a nearby gas station where Acosta died from multiple gunshot and shotgun wounds.
Initially, Caldwell told police that, having heard five to six gunshots, he ran to the scene, arriving after the shooting ended. He later said that he arrived on the scene and saw Henry Martin carrying the shotgun. In support of his habeas petition, Caldwell submitted a declaration stating that he saw Martin firing the shotgun. During a deposition in his civil rights case,[2] Caldwell retracted that statement and said that he did not see Martin firing.
San Francisco Police Department Inspectors Arthur Gerrans and James Crowley responded to the gas station, investigated the murder scene, and spoke with witnesses, many of whom were unresponsive; no one identified the suspects. During a police interview in the hospital, Bobila described the dealers as young black men and thought he could identify them from their photographs. The inspectors questioned the two passengers, Aguirre and Viray, who corroborated Bobila's version *83 of the events. Aguirre described one *183 of the suspects as a black male, with a Jheri-curl hairstyle, and five feet, four to six inches tall, which matched Caldwell's appearance at that time.
On July 12, 1990, San Francisco Police Captain Diarmuid Philpott received an anonymous tip-which he provided to Gerrans and Crowley-to "check out" Maurice Caldwell because he's "been shooting off guns in the projects." The police canvassed the area and Gerrans interviewed Mary Cobbs. During a taped interview inside her apartment, Cobbs told Gerrans that on the night of the murder, awakened by gunshots, she looked out her window, and she saw a shirtless, light-skinned black male, aged 21-25, five feet, four inches tall, weighing 150 pounds, wearing dark sweat pants, firing a shotgun at the departing victims' car. Cobbs's description of the shotgun shooter was consistent with Caldwell's appearance at the time. Cobbs said she did not think the shooters were from the area.
On July 18, 1990, Caldwell told the inspectors that he was not present at the murder scene, that he had been inside at "Debbie's house" during the shooting, and that the victims' car was driving away when he came outside.
On July 26, 1990, Cobbs positively identified Caldwell during a photographic lineup. She told the inspectors that she "heard they call him Twan" and that twice the previous week Caldwell had threatened her, saying: "Bitch, we gonna' fuck you and your family up if you talk to the police."
On July 27, 1990, during a photographic lineup, Bobila selected Caldwell's photograph as the person he thought he was talking to during the drug deal and who punched him in the face, although he was not "100% sure."
On September 21, 1990, Caldwell was arrested for the murder of Acosta and attempted murder of Bobila. During an interview with police that same day, Caldwell said that he was at his aunt's house with a woman named Tina during the murder and that he ran outside after the shooting ended. He claimed not to know his aunt's last name or her address. Caldwell also refused to provide Tina's last name.
After the arrest, police conducted a live lineup attended by Cobbs, Bobila, Aguirre, and Viray. Cobbs identified Caldwell as the shotgun shooter; Bobila and Aguirre each put a question mark next to Caldwell on the lineup card; and Viray did not identify Caldwell. At trial Bobila testified that he identified Caldwell during the lineup as the person whose photograph he had selected from the photographic lineup.
The inspectors interviewed Caldwell's aunt, Deborah Rodriguez, who told them that she spoke to Caldwell while he was in jail. She said Caldwell was *184 at her house the night of the murder and that, after a few gunshots, he ran out of her house without a shirt on. Jacqueline Williams, Rodriguez's friend who was at her house the night of the murder, said that Caldwell was upstairs with a woman named Linda and that he ran out of the apartment shirtless.
On October 17, 1990, Caldwell's trial attorney provided the inspectors with Caldwell's version of the events: Funches had the handgun, Erick Brown punched Bobila, and Martin had the shotgun. The inspectors showed Cobbs, Bobila, Aguirre, and Viray three different photo spreads that variously included photographs of Funches, Brown, and Martin; they could not identify anyone in the photo spreads.
*84 The inspectors searched unsuccessfully for Funches, Brown, and Martin. Martin did not fit the witnesses' description of the shotgun shooter.
B. The criminal case
On December 3, 1990, the court conducted the preliminary hearing, at which Cobbs and Bobila testified. Caldwell's trial counsel cross-examined Cobbs extensively. He attempted to impeach Cobbs's testimony both with her statements to the police and with questions about statements she allegedly made to a neighbor, Dorothy Wiggins-a witness he anticipated calling. Caldwell was held to answer on the charges. On December 14, 1990, the San Francisco District Attorney charged Caldwell with murder (Count 1; § 187), attempted first degree murder (Count 2; §§ 664/187), and felony discharge of a firearm at an occupied vehicle (Count 3; § 246). As to each count, the information alleged that Caldwell used a firearm to inflict great bodily injury on the victims (§ 12022.5, subd. (b) ), and that the offenses were serious felonies (§ 1192.7, subd. (c)(8) ). Aguirre also testified that Caldwell resembled one of the people present at the shooting.
Cobbs testified that she was positive Caldwell was the shotgun shooter. She clearly saw Caldwell, without a shirt on, holding the shotgun; a street light illuminated the area; there were no obstructions; and she recognized him from his presence in the area before the shooting. Cobbs testified that the interview with Gerrans in her apartment was interrupted by a knock on the door (by Sergeant Crenshaw), and the only person she saw outside was another police officer.[3] (See People v. Maurice A. Caldwell (Aug. 27, 1992, A053626) [nonpub. opn.].) Cobbs also testified about Caldwell's threats to her and her family.
*185 Caldwell's defense was that the shotgun did not cause Acosta's death and that he was not present during the murder. Rodriguez testified that Caldwell ran out of her apartment after the initial shots wearing a T-shirt and that he did not have a shotgun. Alice Carruthers testified that she observed Funches fire a handgun at the victims and that she heard more shots as she ran home. Betty Jean Tyler testified that at the time of the shooting, Caldwell had been living in her apartment at 949 Ellsworth, next door to Cobbs's apartment. Caldwell did not testify, and he did not challenge Cobbs's identification at trial.
On March 20, 1991, the jury found Caldwell guilty of second degree murder, attempted murder, and discharging a weapon at an occupied vehicle and found two of the personal-use-of-a-firearm enhancement allegations to be true. This court affirmed Caldwell's conviction.
C. The habeas proceedings
In 2009, Caldwell filed a petition for writ of habeas corpus alleging his imprisonment was unlawful because: 1) newly discovered evidence undermined the People's case; 2) he was convicted on false testimony; 3) he was denied effective assistance of counsel;
*85 4) these cumulative errors denied him due process; and 5) he is actually innocent.
In support of his habeas petition, Caldwell submitted: (1) a declaration from his trial counsel, Craig Martin, stating that he did not hire investigators to work on the case; (2) his own declaration stating that he observed Henry Martin fire the shotgun; (3) Marritte Funches's[4] declaration stating that he shot the handgun, that one of his "homeboys" fired the shotgun, that Caldwell was not present, and that one of the victims advanced on him with a knife before Funches shot him; (4) Demetrius Jones's declaration stating that Caldwell was not present, Funches shot the handgun, and Henry Martin fired the shotgun; (5) Marcus Mendez's declaration that when he looked out of his mother's apartment after shots were fired, he saw Caldwell running towards the group with nothing in his hands; and (6) Maurice Tolliver's declaration describing the shooting.
Tolliver stated that he observed at close range the entire incident from the arrival of the victims' car through its speedy departure. Tolliver observed the drug sale, the argument between the Filipino buyer and the seller, and *186 Funches shooting the "Filipino guy" with a handgun. "After [Funches] started shooting, [Martin], who had stayed at the side of the building, started shooting a larger gun that he held with two hands." Funches continued shooting as the victims tried to escape. "As the guys in the car were trying to do a u-turn to get out of there, [Martin] passed the gun that he had been firing to a taller guy who went toward the corner of the building by Ellsworth and shot at the car some more as they were trying to leave."
The trial court granted Caldwell's petition for a writ of habeas corpus on the sole ground that he received ineffective assistance of counsel.
The San Francisco District Attorney refiled the murder case against Caldwell. Because Cobbs died in 1998, the People moved to admit her trial testimony. The defense objected and the trial court excluded her testimony because the People could not locate the diagram Cobbs used to describe the incidents; the trial court did not find Cobbs's testimony unreliable. As a result of the court's evidentiary ruling, the People were unable to proceed with the trial, and moved to dismiss the case. Caldwell was released from custody on March 28, 2011.
D. The federal case and Victim Compensation Board claim
On April 16, 2012, Caldwell filed a federal lawsuit against the City and County of San Francisco and various San Francisco police officers involved in the murder investigation (federal case). During the federal case, Caldwell developed evidence that he submitted in support of his factual innocence motion, including: (1) Tina McCullum's 2013 declaration stating that she was with Caldwell the night of the murder, and that after Caldwell left the bedroom, no more shots were fired; (2) Caldwell's 2013 declaration in support of his section 4900 claim for compensation stating that he saw Martin at the scene of the murder holding a shotgun; (3) Caldwell's habeas counsel's 2013 declaration[5] that, if given immunity, Martin would provide a statement that Caldwell was not present at the shooting and-from her observation of Cobbs's apartment-Cobbs could not have seen the events about which she testified at trial; and (4) various deposition excerpts, articles, *86 and items from the original investigative file.
On March 21, 2013, Caldwell filed a section 4900 claim with the California State Victim's Compensation and Government Claims Board (now Victim's Compensation Board (Board) ) (claim).
On March 2, 2016, in the federal case the district court granted the defendants' motion for summary judgment. Caldwell appealed that ruling to *187 the Ninth Circuit Court of Appeals, which affirmed in part, reversed in part, and remanded the matter to the district court.[6] ( Caldwell v. City and County of San Francisco (2018) 889 F.3d 1105, 1120.)
E. Factual innocence motion
Caldwell filed a motion for finding of factual innocence on August 3, 2015, and supplemented the evidence submitted in support of the habeas petition with evidence developed during the federal case, including declarations and deposition testimony from additional witnesses and Caldwell. In his 2009 habeas petition, Caldwell declared that, upon arriving at the scene of the shooting, "I saw Henry Martin standing at the corner of the 947 Ellsworth Street building in which Mary Cobbs lived, firing a shotgun. I could not see what he was shooting at. I saw him fire one shot and then take off running down Ellsworth Street." In his 2013 declaration supporting his section 4900 petition, Caldwell stated, "I saw Henry Martin running away with a shotgun." Asked about the discrepancy during his 2015 federal case deposition, Caldwell acknowledged that the statement in his 2009 declaration was false and that he did not see Martin shoot the shotgun.
In a detailed discussion of the evidence, the court noted the inconsistencies among the trial testimony, habeas declarations and federal case evidence. The court "thoroughly reviewed the materials presented by both sides," was "not convinced by a preponderance of the evidence that [Caldwell] is innocent" and, on May 31, 2016, denied "the motion for a finding of innocence pursuant to Penal Code section 1485.55, subdivision (b)." On July 12, 2016, Caldwell timely filed his notice of appeal.
The California Victim Compensation Board postponed its decision on Caldwell's claim pending our deciding the appeal.[7]
*188 DISCUSSION
I. The order is appealable.
The People contend we must dismiss this appeal because an order denying a factual innocence motion is not appealable. They cite People v. Loper (2015) 60 Cal.4th 1155, 1159, 184 Cal.Rptr.3d 715, 343 P.3d 895 for the proposition that a party may only appeal where that right is express in the statute. They reason that the absence of a specific appeal mechanism in section 1485.55 evidences the Legislature's intent that an order denying relief not be appealable. ( *87 In re Anthony (2015) 236 Cal.App.4th 204, 215, 186 Cal.Rptr.3d 343 ( Anthony ) [a section 1485.55 order is not appealable by the People ].) The People urge us to read the legislative intent as inimical to allowing defendants to appeal: [T]he legislative intent behind section 1485.55... "was 'to streamline and clarify the process for compensating exonorees' [Citation.] In addition, the changes were intended to ' "make the system" ' ' "[l]ess expensive by saving taxpayer money spent on years of costly litigation where innocence has already been proven." ' ( People v. Etheridge (2015) 241 Cal.App.4th 800, 807 [194 Cal.Rptr.3d 308] ( Etheridge ).)" The People warn of "[c]ostly litigation" resulting from affording Caldwell appellate rights and argue that an exonerated defendant can ask the Victim Compensation Board to decide his innocence.
Caldwell disagrees, distinguishing the broad appellate rights section 1237, subdivision (b) affords defendants from the constraints imposed on the People by section 1238, subdivision (a)(5), on which Anthony was decided. Finding no authority on point, Caldwell relies on Etheridge , where the court decided the merits of defendant's appeal from denial of his section 1488.55, subdivision (b) motion without specifically holding that the order was appealable. Because an appellate court is "duty bound" to consider appealability before deciding a case, Caldwell argues that the Etheridge court must necessarily have determined sub silentio that an order denying section 1485.55 relief is appealable.
We agree that Anthony is inapposite. That section 1238, subdivision (a)(5) does not authorize the People's appeal (from an order granting defendant's factual innocence motion) does not inform our decision on a defendant's appeal under section 1237, subdivision (b). ( Anthony , supra , 236 Cal.App.4th at p. 206, 186 Cal.Rptr.3d 343.) " 'The prosecution's right to appeal in a criminal case is strictly limited by statute. [Citation.] Long-standing authority requires adherence to these limits even though "the People may thereby suffer a wrong without a remedy." [Citation.] The circumstances allowing a People's appeal are enumerated in section 1238.' " ( Anthony , supra , 236 Cal.App.4th at p. 211, 186 Cal.Rptr.3d 343, quoting *189 People v. Chacon (2007) 40 Cal.4th 558, 564, 53 Cal.Rptr.3d 876, 150 P.3d 755.) " ' "[C]ourts are precluded from so interpreting section 1238 as to expand the People's right of appeal into areas other than those clearly specified by the Legislature." ' " ( Ibid . ) In contrast, a criminal defendant may appeal "[f]rom any order made after judgment, affecting the substantial rights of the party." (§ 1237, subd. (b).)
We agree with Caldwell that, mindful of its jurisdictional duties, the Etheridge court necessarily determined that the order was appealable before deciding the merits. ( Olson v. Cory (1983) 35 Cal.3d 390, 398, 197 Cal.Rptr. 843, 673 P.2d 720 ; Baker v. Castaldi (2015) 235 Cal.App.4th 218, 222, 185 Cal.Rptr.3d 17 ["[i]t is the duty of an Appellate Court on its own motion to dismiss an appeal from an order which is not appealable"].) We also agree with the Etheridge court's implicit conclusion that the trial court's denial of his motion "affect[ed] [Etheridge's] substantial rights." (§ 1237, subd. (b).)
Lacking controlling authority as to the appealability of section 1488.55 orders, we look to our high court's application of section 1237, subdivision (b) to statutes which do not expressly afford defendants appellate rights. The Supreme Court regularly allows defendants to appeal notwithstanding the absence of a specific appellate mechanism in the statute under which they seek relief and liberally interprets section 1237, subdivision (b)'s requirement that the challenged order must affect the defendant's *88 substantial rights. "[A] postjudgment order 'affecting the substantial rights of the party' (§ 1237, subd. (b) ) does not turn on whether that party's claim is meritorious, but instead on the nature of the claim and the court's ruling thereto." ( Teal v. Superior Court (2014) 60 Cal.4th 595, 600, 179 Cal.Rptr.3d 365, 336 P.3d 686, italics added [orders under section 1170.126 and the Three Strikes Reform Act of 2012 "create a substantial right to be resentenced" and are appealable]; cf. People v. Mena (2012) 54 Cal.4th 146, 152-153, 141 Cal.Rptr.3d 469, 277 P.3d 160 [order denying lineup motion affected " 'substantial right of the defendant,' " allowing appeal]; People v. Gamache (2010) 48 Cal.4th 347, 375, fn. 13, 106 Cal.Rptr.3d 771, 227 P.3d 342 ["[s]ection 1259 permits appellate review of claimed errors to the extent they 'affected the substantial rights of the defendant' " (italics added) ]; People v. Totari (2002) 28 Cal.4th 876, 887, 123 Cal.Rptr.2d 76, 50 P.3d 781 [an order denying an immigrant defendant's section 1016.5 motion to vacate the judgment is appealable under section 1237, subdivision (b) ].)
Imprisoned for more than twenty years due to the ineffectiveness of his assigned counsel, Caldwell is pursuing a "substantial right" by asking us to reconsider his factual innocence claim. The possibility of obtaining monetary relief in the pending Board claim does not diminish the importance to Caldwell of appellate review of the trial court's decision. We conclude that a defendant may appeal denial of a factual innocence motion pursuant to section 1237, subdivision (b).
*190 II.-III.***
DISPOSITION
The order denying Caldwell's factual innocence motion is affirmed.
We concur:
Siggins, P.J.
Jenkins, J.

Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

All further statutory references are to the Penal Code unless otherwise noted.

On April 16, 2012, Caldwell filed a federal lawsuit against the City and County of San Francisco and various San Francisco Police officers involved in the murder investigation (federal case).

Caldwell claims that Cobbs's identification of him was tainted by the police bringing him to Cobbs's door during the interview. During trial, Cobbs testified on direct examination that the only person who came to the door while speaking to Gerrans was another officer which was consistent with her preliminary hearing testimony. At trial, Gerrans confirmed that when Sergeant Crenshaw knocked on the door he was alone. At oral argument, counsel contended that Caldwell was denied the opportunity to question Cobbs about that event, but the record is clear that she was cross-examined about it during the preliminary hearing and counsel could have revisited the issue at trial but apparently chose not to do so.

Funches was convicted of murder and is serving a life sentence in Nevada.

The declaration was submitted in support of Caldwell's section 4900 claim.

The Ninth Circuit's decision has no bearing on our analysis here. The court found that summary judgment on Caldwell's action under 42 U.S.C. § 1983 was improper because there were genuine issues of material fact concerning Caldwell's claims that Sergeant Crenshaw fabricated evidence against him. (Caldwell v. City and County of San Francisco , supra , 889 F.3d at pp. 1112-1118.) Under the standard of review governing motions for summary judgment, the Ninth Circuit made no findings of fact and did not consider the issue of Caldwell's innocence under a preponderance of the evidence standard.

We take judicial notice of In the Matter of the Claim of Maurice Caldwell, Notice of Decision, Victim Compensation Board of the State of California (Board), Claim No. 13-ECO-01 (Oct. 25, 2017). (Evid. Code, § 451.)

See footnote *, ante .