Filed 12/17/18 (unmodified opinion attached)

# CERTIFIED FOR PARTIAL PUBLICATION[*]

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>MAURICE CALDWELL,<br><br>     Defendant and Appellant. | A148828<br><br>(City & County of San Francisco<br>Super. Ct. No. 1260545)<br>ORDER MODIFYING OPINION AND<br>DENYING REHEARING; NO CHANGE<br>IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on November 15, 2018, be modified as follows:

1. On page 3, lines 4-7, the following two sentences are deleted: "Cobbs's description of the shotgun shooter matched that given by Bobila and fit Caldwell's appearance at the time. Her description of admitted handgun shooter Funches also matched his appearance at the time of the murder."

   The following sentence is inserted in their place: "Cobbs's description of the shotgun shooter was consistent with Caldwell's appearance at the time."

2. On page 20, lines 14-15, the following sentence is deleted: "That Caldwell was the second shooter seen by Tolliver and identified by Cobbs resolves any discrepancy on which Caldwell relies." The following sentences are inserted in its place: "The thrust of Caldwell's argument is that Martin fired the shotgun and therefore Caldwell was not the shooter. Tolliver's declaration provides an alternative: even if Martin fired the shotgun, a second person also fired the shotgun. At trial and in opposition to the

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II and III of the Discussion.

factual innocence motion, the People presented evidence that Caldwell was that person."

3. On page 20, lines 18-19, the following sentence is deleted: "The post-conviction evidence does not refute compelling evidence that Caldwell was the shotgun shooter." The following sentence is inserted in its place: "The post-conviction evidence does not refute compelling evidence that Caldwell fired the shotgun."

There is no change in the judgment. Appellant's petition for rehearing is denied.

Date: \_\_\_\_SIGGINS, P.J._____ Presiding Justice

2

**CERTIFIED FOR PARTIAL PUBLICATION**<sup>*</sup>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>MAURICE CALDWELL,<br><br>　　　　Defendant and Appellant. | A148828<br><br>(City & County of San Francisco<br>Super. Ct. No. 1260545) |

Appellant Maurice Caldwell's 1991 second degree murder conviction was reversed when the trial court granted his habeas corpus petition. Caldwell's habeas petition alleged various grounds for relief—including the actual innocence claim at issue here—but the sole basis for granting the petition was the ineffective assistance of his trial counsel. Caldwell filed a subsequent Penal Code section 1485.55[1] motion for a finding of factual innocence (factual innocence motion), which the trial court denied. Caldwell appeals. The People contend that the order is not appealable. We hold that the order is appealable, review the record de novo and affirm the trial court's decision.

**FACTUAL AND PROCEDURAL BACKGROUND**

**A. The murder and investigation**

On June 30, 1990, at approximately 2:30 a.m., Judy Acosta was murdered, and his friend, Domingo Bobila, was injured when they were shot during a drug deal in the Alemany Housing Project in San Francisco. Acosta and Bobila drove to the 900 block of

---

<sup>*</sup> Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II and III of the Discussion.

[1] All further statutory references are to the Penal Code unless otherwise noted.

Ellsworth Street with their friends Eric Aguirre and Dominador Viray. Having spent the evening drinking beer, the men decided to buy crack cocaine in the Alemany projects, an area known for drug sales and violent crime. During the drug buy, a drug seller punched Bobila in the face. Marritte Funches then shot Acosta several times in the chest at close range with a handgun. The People presented evidence—which Caldwell disputes—that Caldwell arrived and fired a shotgun at Acosta and Bobila. As they were hit by the shotgun pellets, Bobila pulled Acosta into the car and drove to a nearby gas station where Acosta died from multiple gunshot and shotgun wounds.

Initially, Caldwell told police that, having heard five to six gunshots, he ran to the scene, arriving after the shooting ended. He later said that he arrived on the scene and saw Henry Martin carrying the shotgun. In support of his habeas petition, Caldwell submitted a declaration stating that he saw Martin firing the shotgun. During a deposition in his civil rights case,[2] Caldwell retracted that statement and said that he did not see Martin firing.

San Francisco Police Department Inspectors Arthur Gerrans and James Crowley responded to the gas station, investigated the murder scene, and spoke with witnesses, many of whom were unresponsive; no one identified the suspects. During a police interview in the hospital, Bobila described the dealers as young black men and thought he could identify them from their photographs. The inspectors questioned the two passengers, Aguirre and Viray, who corroborated Bobila's version of the events. Aguirre described one of the suspects as a black male, with a Jheri-curl hairstyle, and five feet, four to six inches tall, which matched Caldwell's appearance at that time.

On July 12, 1990, San Francisco Police Captain Diarmuid Philpott received an anonymous tip—which he provided to Gerrans and Crowley—to "check out" Maurice Caldwell because he's "been shooting off guns in the projects." The police canvassed the area and Gerrans interviewed Mary Cobbs. During a taped interview inside her

---

[2] On April 16, 2012, Caldwell filed a federal lawsuit against the City and County of San Francisco and various San Francisco Police officers involved in the murder investigation (federal case).

2

apartment, Cobbs told Gerrans that on the night of the murder, awakened by gunshots, she looked out her window, and she saw a shirtless, light-skinned black male, aged 21-25, five feet, four inches tall, weighing 150 pounds, wearing dark sweat pants, firing a shotgun at the departing victims' car. Cobbs's description of the shotgun shooter matched that given by Bobila and fit Caldwell's appearance at the time. Her description of admitted handgun shooter Funches also matched his appearance at the time of the murder. Cobbs said she did not think the shooters were from the area.

On July 18, 1990, Caldwell told the inspectors that he was not present at the murder scene, that he had been inside at "Debbie's house" during the shooting, and that the victims' car was driving away when he came outside.

On July 26, 1990, Cobbs positively identified Caldwell during a photographic lineup. She told the inspectors that she "heard they call him Twan" and that twice the previous week Caldwell had threatened her, saying: "Bitch, we gonna' fuck you and your family up if you talk to the police."

On July 27, 1990, during a photographic lineup, Bobila selected Caldwell's photograph as the person he thought he was talking to during the drug deal and who punched him in the face, although he was not "100% sure."

On September 21, 1990, Caldwell was arrested for the murder of Acosta and attempted murder of Bobila. During an interview with police that same day, Caldwell said that he was at his aunt's house with a woman named Tina during the murder and that he ran outside after the shooting ended. He claimed not to know his aunt's last name or her address. Caldwell also refused to provide Tina's last name.

After the arrest, police conducted a live lineup attended by Cobbs, Bobila, Aguirre, and Viray. Cobbs identified Caldwell as the shotgun shooter; Bobila and Aguirre each put a question mark next to Caldwell on the lineup card; and Viray did not identify Caldwell. At trial Bobila testified that he identified Caldwell during the lineup as the person whose photograph he had selected from the photographic lineup.

The inspectors interviewed Caldwell's aunt, Deborah Rodriguez, who told them that she spoke to Caldwell while he was in jail. She said Caldwell was at her house the

3

night of the murder and that, after a few gunshots, he ran out of her house without a shirt on. Jacqueline Williams, Rodriguez's friend who was at her house the night of the murder, said that Caldwell was upstairs with a woman named Linda and that he ran out of the apartment shirtless.

On October 17, 1990, Caldwell's trial attorney provided the inspectors with Caldwell's version of the events: Funches had the handgun, Erick Brown punched Bobila, and Martin had the shotgun. The inspectors showed Cobbs, Bobila, Aguirre, and Viray three different photo spreads that variously included photographs of Funches, Brown, and Martin; they could not identify anyone in the photo spreads.

The inspectors searched unsuccessfully for Funches, Brown, and Martin. Martin did not fit the witnesses' description of the shotgun shooter.

## B. The criminal case

On December 3, 1990, the court conducted the preliminary hearing, at which Cobbs and Bobila testified. Caldwell's trial counsel cross-examined Cobbs extensively. He attempted to impeach Cobbs's testimony both with her statements to the police and with questions about statements she allegedly made to a neighbor, Dorothy Wiggins—a witness he anticipated calling. Caldwell was held to answer on the charges. On December 14, 1990, the San Francisco District Attorney charged Caldwell with murder (Count 1; § 187), attempted first degree murder (Count 2; §§ 664/187), and felony discharge of a firearm at an occupied vehicle (Count 3; § 246). As to each count, the information alleged that Caldwell used a firearm to inflict great bodily injury on the victims (§ 12022.5, subd. (b)), and that the offenses were serious felonies (§ 1192.7, subd. (c)(8)). Aguirre also testified that Caldwell resembled one of the people present at the shooting.

Cobbs testified that she was positive Caldwell was the shotgun shooter. She clearly saw Caldwell, without a shirt on, holding the shotgun; a street light illuminated the area; there were no obstructions; and she recognized him from his presence in the area before the shooting. Cobbs testified that the interview with Gerrans in her apartment was interrupted by a knock on the door (by Sergeant Crenshaw), and the only person she

4

saw outside was another police officer.[3] (See *People v. Maurice A. Caldwell* (Aug. 27, 1992, A053626) [nonpub. opn.].) Cobbs also testified about Caldwell's threats to her and her family.

Caldwell's defense was that the shotgun did not cause Acosta's death and that he was not present during the murder. Rodriguez testified that Caldwell ran out of her apartment after the initial shots wearing a T-shirt and that he did not have a shotgun. Alice Carruthers testified that she observed Funches fire a handgun at the victims and that she heard more shots as she ran home. Betty Jean Tyler testified that at the time of the shooting, Caldwell had been living in her apartment at 949 Ellsworth, next door to Cobbs's apartment. Caldwell did not testify, and he did not challenge Cobbs's identification at trial.

On March 20, 1991, the jury found Caldwell guilty of second degree murder, attempted murder, and discharging a weapon at an occupied vehicle and found two of the personal-use-of-a-firearm enhancement allegations to be true. This court affirmed Caldwell's conviction.

## C. The habeas proceedings

In 2009, Caldwell filed a petition for writ of habeas corpus alleging his imprisonment was unlawful because: 1) newly discovered evidence undermined the People's case; 2) he was convicted on false testimony; 3) he was denied effective assistance of counsel; 4) these cumulative errors denied him due process; and 5) he is actually innocent.

---

[3] Caldwell claims that Cobbs's identification of him was tainted by the police bringing him to Cobbs's door during the interview. During trial, Cobbs testified on direct examination that the only person who came to the door while speaking to Gerrans was another officer which was consistent with her preliminary hearing testimony. At trial, Gerrans confirmed that when Sergeant Crenshaw knocked on the door he was alone. At oral argument, counsel contended that Caldwell was denied the opportunity to question Cobbs about that event, but the record is clear that she was cross-examined about it during the preliminary hearing and counsel could have revisited the issue at trial but apparently chose not to do so.

In support of his habeas petition, Caldwell submitted: (1) a declaration from his trial counsel, Craig Martin, stating that he did not hire investigators to work on the case; (2) his own declaration stating that he observed Henry Martin fire the shotgun; (3) Marritte Funches's[4] declaration stating that he shot the handgun, that one of his "homeboys" fired the shotgun, that Caldwell was not present, and that one of the victims advanced on him with a knife before Funches shot him; (4) Demetrius Jones's declaration stating that Caldwell was not present, Funches shot the handgun, and Henry Martin fired the shotgun; (5) Marcus Mendez's declaration that when he looked out of his mother's apartment after shots were fired, he saw Caldwell running towards the group with nothing in his hands; and (6) Maurice Tolliver's declaration describing the shooting.

Tolliver stated that he observed at close range the entire incident from the arrival of the victims' car through its speedy departure. Tolliver observed the drug sale, the argument between the Filipino buyer and the seller, and Funches shooting the "Filipino guy" with a handgun. "After [Funches] started shooting, [Martin], who had stayed at the side of the building, started shooting a larger gun that he held with two hands." Funches continued shooting as the victims tried to escape. "As the guys in the car were trying to do a u-turn to get out of there, [Martin] passed the gun that he had been firing to a taller guy who went toward the corner of the building by Ellsworth and shot at the car some more as they were trying to leave.

The trial court granted Caldwell's petition for a writ of habeas corpus on the sole ground that he received ineffective assistance of counsel.

The San Francisco District Attorney refiled the murder case against Caldwell. Because Cobbs died in 1998, the People moved to admit her trial testimony. The defense objected and the trial court excluded her testimony because the People could not locate the diagram Cobbs used to describe the incidents; the trial court did not find Cobbs's testimony unreliable. As a result of the court's evidentiary ruling, the People were unable

---

[4] Funches was convicted of murder and is serving a life sentence in Nevada.

to proceed with the trial, and moved to dismiss the case. Caldwell was released from custody on March 28, 2011.

### D. The federal case and Victim Compensation Board claim

On April 16, 2012, Caldwell filed a federal lawsuit against the City and County of San Francisco and various San Francisco police officers involved in the murder investigation (federal case). During the federal case, Caldwell developed evidence that he submitted in support of his factual innocence motion, including: (1) Tina McCullum's 2013 declaration stating that she was with Caldwell the night of the murder, and that after Caldwell left the bedroom, no more shots were fired; (2) Caldwell's 2013 declaration in support of his section 4900 claim for compensation stating that he saw Martin at the scene of the murder holding a shotgun; (3) Caldwell's habeas counsel's 2013 declaration[5] that, if given immunity, Martin would provide a statement that Caldwell was not present at the shooting and—from her observation of Cobbs's apartment—Cobbs could not have seen the events about which she testified at trial; and (4) various deposition excerpts, articles, and items from the original investigative file.

On March 21, 2013, Caldwell filed a section 4900 claim with the California State Victim's Compensation and Government Claims Board (now Victim's Compensation Board (Board)) (claim).

On March 2, 2016, in the federal case the district court granted the defendants' motion for summary judgment. Caldwell appealed that ruling to the Ninth Circuit Court of Appeals, which affirmed in part, reversed in part, and remanded the matter to the district court.[6] (*Caldwell v. City and County of San Francisco* (2018) 889 F.3d 1105, 1120.)

---

[5] The declaration was submitted in support of Caldwell's section 4900 claim.

[6] The Ninth Circuit's decision has no bearing on our analysis here. The court found that summary judgment on Caldwell's action under 42 U.S.C. § 1983 was improper because there were genuine issues of material fact concerning Caldwell's claims that Sergeant Crenshaw fabricated evidence against him. (*Caldwell v. City and County of San Francisco*, *supra*, 889 F.3d at pp. 1112–1118.) Under the standard of review governing motions for summary judgment, the Ninth Circuit made no findings of

7

## E. Factual innocence motion

Caldwell filed a motion for finding of factual innocence on August 3, 2015, and supplemented the evidence submitted in support of the habeas petition with evidence developed during the federal case, including declarations and deposition testimony from additional witnesses and Caldwell. In his 2009 habeas petition, Caldwell declared that, upon arriving at the scene of the shooting, "I saw Henry Martin standing at the corner of the 947 Ellsworth Street building in which Mary Cobbs lived, firing a shotgun. I could not see what he was shooting at. I saw him fire one shot and then take off running down Ellsworth Street." In his 2013 declaration supporting his section 4900 petition, Caldwell stated, "I saw Henry Martin running away with a shotgun." Asked about the discrepancy during his 2015 federal case deposition, Caldwell acknowledged that the statement in his 2009 declaration was false and that he did not see Martin shoot the shotgun.

In a detailed discussion of the evidence, the court noted the inconsistencies among the trial testimony, habeas declarations and federal case evidence. The court "thoroughly reviewed the materials presented by both sides," was "not convinced by a preponderance of the evidence that [Caldwell] is innocent" and, on May 31, 2016, denied "the motion for a finding of innocence pursuant to Penal Code section 1485.55, subdivision (b)." On July 12, 2016, Caldwell timely filed his notice of appeal.

The California Victim Compensation Board postponed its decision on Caldwell's claim pending our deciding the appeal.[7]

---

fact and did not consider the issue of Caldwell's innocence under a preponderance of the evidence standard.

[7] We take judicial notice of *In the Matter of the Claim of Maurice Caldwell, Notice of Decision*, Victim Compensation Board of the State of California (Board), Claim No. 13-ECO-01 (Oct. 25, 2017). (Evid. Code, § 451.)

## DISCUSSION

### I. The order is appealable.

The People contend we must dismiss this appeal because an order denying a factual innocence motion is not appealable. They cite *People v. Loper* (2015) 60 Cal.4th 1155, 1159 for the proposition that a party may only appeal where that right is express in the statute. They reason that the absence of a specific appeal mechanism in section 1485.55 evidences the Legislature's intent that an order denying relief not be appealable. (*In re Anthony* (2015) 236 Cal.App.4th 204, 215 (*Anthony*) [a section 1485.55 order is not appealable *by the People*].) The People urge us to read the legislative intent as inimical to allowing defendants to appeal: "[T]he legislative intent behind section 1485.55 . . . 'was "to streamline and clarify the process for compensating exonorees [Citation.] In addition, the changes were intended to ' "make the system" ' ' "[l]ess expensive by saving taxpayer money spent on years of costly litigation where innocence has already been proven." ' (*People v. Etheridge* (2015) 241 Cal.App.4th 800, 807 (*Etheridge*).)" The People warn of "[c]ostly litigation" resulting from affording Caldwell appellate rights and argue that an exonerated defendant can ask the Victim Compensation Board to decide his innocence.

Caldwell disagrees, distinguishing the broad appellate rights section 1237, subdivision (b) affords defendants from the constraints imposed on the People by section 1238, subdivision (a)(5), on which *Anthony* was decided. Finding no authority on point, Caldwell relies on *Etheridge*, where the court decided the merits of defendant's appeal from denial of his section 1488.55, subdivision (b) motion without specifically holding that the order was appealable. Because an appellate court is "duty bound" to consider appealability before deciding a case, Caldwell argues that the *Etheridge* court must necessarily have determined sub silentio that an order denying section 1485.55 relief is appealable.

We agree that *Anthony* is inapposite. That section 1238, subdivision (a)(5) does not authorize the People's appeal (from an order granting defendant's factual innocence motion) does not inform our decision on a defendant's appeal under section 1237,

9

subdivision (b). (*Anthony*, *supra*, 236 Cal.App.4th at p. 206.) " 'The prosecution's right to appeal in a criminal case is strictly limited by statute. [Citation.] Long-standing authority requires adherence to these limits even though "the People may thereby suffer a wrong without a remedy." [Citation.] The circumstances allowing a People's appeal are enumerated in section 1238.' " (*Anthony*, *supra*, 236 Cal.App.4th at p. 211, quoting *People v. Chacon* (2007) 40 Cal.4th 558, 564.) " ' "[C]ourts are precluded from so interpreting section 1238 as to expand the People's right of appeal into areas other than those clearly specified by the Legislature." ' " (*Ibid.*) In contrast, a criminal defendant may appeal "[f]rom any order made after judgment, affecting the substantial rights of the party." (§ 1237, subd. (b).)

We agree with Caldwell that, mindful of its jurisdictional duties, the *Etheridge* court necessarily determined that the order was appealable before deciding the merits. (*Olson v. Cory* (1983) 35 Cal.3d 390, 398; *Baker v. Castaldi* (2015) 235 Cal.App.4th 218, 222 ["[i]t is the duty of an Appellate Court on its own motion to dismiss an appeal from an order which is not appealable"].) We also agree with the *Etheridge* court's implicit conclusion that the trial court's denial of his motion "affect[ed] [Etheridge's] substantial rights." (§ 1237, subd. (b).)

Lacking controlling authority as to the appealability of section 1488.55 orders, we look to our high court's application of section 1237, subdivision (b) to statutes which do not expressly afford defendants appellate rights. The Supreme Court regularly allows defendants to appeal notwithstanding the absence of a specific appellate mechanism in the statute under which they seek relief and liberally interprets section 1237, subdivision (b)'s requirement that the challenged order must affect the defendant's substantial rights. "[A] postjudgment order 'affecting the substantial rights of the party' (§ 1237, subd. (b)) does not turn on whether that party's claim is meritorious, but instead *on the nature of the claim* and the court's ruling thereto." (*Teal v. Superior Court* (2014) 60 Cal.4th 595, 600, italics added [orders under section 1170.126 and the Three Strikes Reform Act of 2012 "create a substantial right to be resentenced" and are appealable]; cf. *People v. Mena* (2012) 54 Cal.4th 146, 152–153 [order denying lineup motion affected " 'substantial right

10

of the defendant,' " allowing appeal]; *People v. Gamache* (2010) 48 Cal.4th 347, 375, fn. 13 ["[s]ection 1259 permits appellate review of *claimed* errors to the extent they 'affected the substantial rights of the defendant' " (italics added)]; *People v. Totari* (2002) 28 Cal.4th 876, 887 [an order denying an immigrant defendant's section 1016.5 motion to vacate the judgment is appealable under section 1237, subdivision (b)].

Imprisoned for more than twenty years due to the ineffectiveness of his assigned counsel, Caldwell is pursuing a "substantial right" by asking us to reconsider his factual innocence claim. The possibility of obtaining monetary relief in the pending Board claim does not diminish the importance to Caldwell of appellate review of the trial court's decision. We conclude that a defendant may appeal denial of a factual innocence motion pursuant to section 1237, subdivision (b).

## II. The trial court properly admitted Cobbs's trial testimony.

Caldwell argues the trial court should not have admitted Cobbs's trial testimony under section 1291 of the Evidence Code because his trial counsel's ineffective assistance denied him a meaningful opportunity to cross-examine Cobbs at trial. Caldwell contends his trial counsel's "failure to investigate the possibility that [he] was actually innocent and talk to the alleged perpetrators and possible witnesses" directly interfered with defense counsel's ability to challenge Cobbs's testimony on cross-examination. We disagree. Cobbs's prior testimony was admissible under section 1291.[8]

Evidence Code section 1291, subdivision (a) provides: "Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and . . . [¶] . . . [¶]  (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."

There is no dispute that Cobbs was unavailable at the time of Caldwell's motion; she died in 1998. (Evid. Code, § 240, subd. (a)(3) ["unavailable as a witness" includes that the witness is "[d]ead or unable to attend or to testify at the hearing because of then-existing physical or mental illness or infirmity"].)  The only issue is whether Caldwell

---

[8] The People do not address whether Cobbs's testimony was admissible under Evidence Code section 1291, contending hearsay is admissible in considering motions under that statute. The People rely on *Etheridge* for the proposition that section 1485.55 motions are analogous to those under section 851.8, for which they contend hearsay is admissible by pointing to language that "any judicial determination of factual innocence made pursuant to this section may be heard and determined upon declarations, affidavits, police reports, or any other evidence submitted by the parties which is material, relevant, and reliable. (§ 851.8, subd. (b).)  The People suggest it thus follows that courts may also consider hearsay evidence in deciding section 1485.55 motions. We agree with Caldwell that there is no authority for the People's argument. There is no language providing for the admissibility of hearsay in section 1485.55 itself, and the People cite no case authority for that proposition. *Etheridge* is inapposite, because the appellate court there concluded that sections 851.8 and 1485.55 apply different standards and are not analogous. (*Etheridge*, *supra*, 241 Cal.App.4th at p. 808, fn. 3.)

"had the right and opportunity to cross-examine" Cobbs "with an interest and motive similar to that which he" had at the factual innocence hearing. Caldwell does not address the "interest and motive" component, contending instead that his trial counsel's ineffectiveness deprived him of an adequate opportunity to cross-examine Cobbs at trial.

" 'As long as defendant was given the *opportunity* for effective cross-examination, the statutory requirements [of section 1291 are] satisfied; the admissibility of this evidence [does] not depend on whether defendant availed himself fully of that opportunity. [Citations.]' " (*People v. Wilson* (2005) 36 Cal.4th 309, 346.) "[I]t is the opportunity and motive to cross-examine that matters, not the actual cross-examination." (*People v. Smith* (2003) 30 Cal.4th 581, 611.)

Courts have found an insufficient opportunity for cross-examination under section 1291 where a witness refuses to answer questions (*People v. Faolima* (2015) 239 Cal.App.4th 1376, 1390–1391), where the translation of a non-English speaking witness was inaccurate (*People v. Johnson* (1975) 46 Cal.App.3d 701, 704), where the witness was not mentally competent at the earlier hearing (*Stevenson v. Superior Court* (1979) 91 Cal.App.3d 925, 930), and where "counsel had been appointed only five minutes before the preliminary hearing and was thus unable to conduct an adequate cross-examination" (*People v. Brock* (1985) 38 Cal.3d 180, 190, citing *People v. Gibbs* (1967) 255 Cal.App.2d 739).

" 'The presence and participation of counsel . . . do not necessarily ensure the opportunity's adequacy. Qualitative factors play a role. The nature of the proceeding; the character of the witness and [his or her] connection with the events; the extent and subject of his direct testimony; the time and preparatory opportunities available to the accused and his attorney—these are some of the influential factors.' " (*Stevenson v. Superior Court*, *supra*, 91 Cal.App.3d at p. 929.) Insufficient opportunity based upon the ineffectiveness of counsel, however, need not render former testimony inadmissible unless the ineffective assistance affected the cross-examination. (*People v. Jones* (1998) 66 Cal.App.4th 760, 766 (*Jones*).)

13

In *Jones*, the Court of Appeal held that "defendant's opportunity to cross-examine, albeit through appointed counsel, at the first trial was sufficient to satisfy the requirements of" section 1291. (*Jones*, *supra*, 66 Cal.App.4th at p. 764.) Jones had argued the witness's testimony was inadmissible because the court denied Jones the opportunity to represent himself and the witnesses "weren't confronted in the manner that [he] would have done, that [he] would have chosen nor [he] would have liked." (*Id*. at p. 765.) The court concluded Jones had failed to show that the prior cross-examination of witnesses was insufficient: "Although he claimed he would have cross-examined differently, he never explained precisely *what* he would have done differently. Therefore, he never showed his cross-examination would have been any more effective." (*Id.* at p. 768.)

Here, too, Caldwell's defense counsel had ample opportunity to cross-examine Cobbs at trial and did so. We note that of the 128 transcript pages of Cobbs's trial testimony, 75 contain defense counsel's cross-examination; but our analysis is qualitative, not quantitative.

Counsel thoroughly cross-examined Cobbs at the preliminary hearing and used that testimony at trial to impeach her with prior inconsistencies.[9] First he meticulously established every detail of Cobbs's version of the events. He ascertained that Cobbs knew Caldwell by his nickname "Twan" and had seen him between 15 and 20 times as of the time of the murder. He confirmed that she lived at 947 Ellsworth; the murder occurred on the 900 block of Ellsworth. He established that she was in bed in her bedroom which faced the street; was awakened by the sound of breaking glass and the gunfire; heard four shots fired; and then went to the window where she saw two people in a car that was attempting to depart. She testified that the view from her window was the sidewalk, the street and car in front of her window and that Caldwell was standing about six feet behind the car when a shot was fired which hit the car window.

---

[9] Again, while we do not engage in a numerical analysis, we observe that the direct examination of Cobbs at the preliminary hearing consumes less than three pages, the cross-examination occupies 21 pages; there was no redirect.

14

Having pinned down every pertinent detail of Cobbs's statement, he questioned her extensively about the street light location relative to her window and the crime scene and whether she had taken medication. He impeached her with statements from her police interviews. Next, he laid a foundation about her conversations about Caldwell with a neighbor, Dorothy Wiggins, whom he intended to call as a witness. Counsel examined Cobbs about the police interview, the presence of inspectors and others to support Caldwell's argument about the over-suggestive identification.

Caldwell does not contend his opportunity for cross-examination was hampered by inadequate time for counsel to prepare or by Cobbs's refusal to answer questions, but rather that the failure to investigate rendered the cross-examination of Cobbs ineffective.

Our Supreme Court has "recognized that in an extraordinary case, it might be ' "necessary to explore the character of the actual cross-examination to ensure that an adequate opportunity for full cross-examination had been afforded to the defendant." ' " (*People v. Valencia* (2008) 43 Cal.4th 268, 294, quoting *Wilson*, *supra*, 36 Cal.4th at pp. 346–347.) "In *Ohio v. Roberts*, the [United States Supreme Court] explained that in an 'extraordinary' case, for example, where had court had already determined that a defendant received ineffective representation from counsel appointed only four days before trial [citation], 'it was necessary to explore the character of the actual cross-examination to ensure than an adequate opportunity for full cross-examination had been afforded to the defendant.' " (*Wilson*, *supra*, 36 Cal.4th at pp. 346–347.) "Absent such 'unusual circumstances,' no inquiry into effectiveness is required." (*Id*. at p. 347.)

The trial court's habeas finding that Caldwell's defense counsel was ineffective constitutes an extraordinary circumstance which warrants the thorough analysis of the cross-examination we have undertaken. The trial court summarized the ineffectiveness of Caldwell's counsel as his "failure to investigate the possibility that petitioner was actually innocent and talk to alleged perpetrators and possible witnesses," concluding that this failure "made petitioner's trial unfair and rendered the verdict unreliable." The trial court explained, "It could very well be that one or all of these potential witnesses would've

15

been more credible than the witnesses who did testify." The trial court did not identify trial counsel's cross-examination of Cobbs as a basis for its ineffective-assistance finding.

Caldwell contends trial counsel's failure directly affected his cross-examination of Cobbs. Caldwell cites trial counsel's failure: to locate and interview known witnesses and participants; to interview Cobbs or investigate the scene from her perspective; and to investigate police misconduct in obtaining Cobbs's testimony. Caldwell points to post-conviction evidence, presented in support of his habeas petition, that conflicted significantly with or cast doubt on Cobbs's testimony, implicated others in the crimes of which he was accused, and exposed Cobbs's identification of him as "the product of police misconduct." Caldwell argues that, "[a]s a direct consequence of these acknowledged failures, Caldwell's counsel could not conduct an effective and meaningful cross-examination of Cobbs."

We are not persuaded. At trial defense counsel thoroughly cross-examined Cobbs on all the material topics, including what she saw and heard on the night of the incident and the threats she received thereafter. Specific topics of cross-examination included: the number, type, and timing of shots Cobbs heard fired; Cobbs's familiarity with Caldwell, his appearance, and his nickname of "Twan," and that he formerly lived next door to her; Gerrans's July 13, 1990 interview with Cobbs, including playing the recording of the interview and challenging her statement to Gerrans that the shooters were "not from around here"; Caldwell's actions during the incident, including his distance from, and the damage his shots caused to, Acosta's car; and further details about the timing of the threats against her and Caldwell's participation in making them. Defense counsel laboriously highlighted inconsistencies in Cobbs's testimony, often referring back to Cobb's preliminary hearing testimony on the same topics.

Had trial counsel investigated, his cross-examination of Cobbs may have been more persuasive, but having read that testimony—and its extensive reliance on the preliminary hearing cross-examination—we disagree that his investigative failures rendered it inadequate. Trial counsel's exacting preliminary hearing cross examination provided what an out-of-court interview often achieves but had the added benefit of being

16

under oath. Caldwell's conclusory claims that counsel could have developed evidence to "challenge[ ] Cobb's identification of Caldwell" or the reliability of her testimony are speculative. Caldwell's habeas counsel conducted an exhaustive investigation which lead to the successful habeas petition. As we discuss below, counsel developed evidence which disputes Cobbs's testimony, it does not render it unreliable, and in some cases it corroborates her statements.

Caldwell also argues that his due process right was violated by admitting Cobbs's testimony without the photographs and crime scene diagrams she marked at trial. He contends that the trial judge should have excluded Cobbs's testimony at the factual innocence hearing, just as he did before the retrial. But, the trial judge's sole basis for excluding her testimony at retrial was the People's loss of the diagrams about which she testified, as he said, "I certainly didn't make any adverse rulings with respect to the credibility of Mary Cobbs." The reliability of such evidence is a question for the finder of fact and goes " 'to the weight of the evidence, not its admissibility.' " (*People v. Valencia*, *supra*, 43 Cal.4th at p. 295, quoting *People v. Anderson* (2001) 25 Cal.4th 543, 587.)

Caldwell contends that "[l]acking the exhibits, there is no context for Cobbs' (sic) testimony. . . . [and] no way for the trier of fact to weigh her overall testimony against the post-conviction evidence of other eyewitnesses regarding the scene that night or of what she could physically see from her claimed vantage point because the testimony is incomplete and also subject to question in light of this new evidence."

We independently analyzed Cobbs's testimony and, like the trial judge, were able to evaluate it in light of all the countervailing post-conviction evidence. The trial court properly admitted it. Having carefully reviewed the record, we find Caldwell had a legally-sufficient opportunity to cross-examine her at trial.

### III. The trial court properly denied Caldwell's factual innocence motion.

The trial court decided Caldwell's motion based on the pleadings and exhibits without an evidentiary hearing. "Because the trial court's findings were based solely

17

upon documentary evidence, we independently review the record." (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 677.)

## A. Procedural considerations

As an initial matter, Caldwell has not satisfied his burden to show that the trial court erroneously discounted certain evidence or applied the wrong burden of proof in deciding his motion. " 'A judgment or order of the lower court is *presumed correct.* All intendments and presumptions are indulged to support it on matter as to which the record is silent, and error must be affirmatively shown. . . . ' " (*People v. Wiley* (1995) 9 Cal.4th 580, 592, fn. 7, quoting *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) Caldwell argues that the court's detailed analysis of the evidence indicates that it inappropriately discounted its import: "[D]ecades later, some previously silent witnesses to the shooting have provided declarations that state Caldwell was not the shotgun shooter. Those witnesses did not testify at trial, claiming they either were not contacted by Caldwell's attorney to testify, or simply did not want to get involved at that time." Caldwell claims that his failure to "mention . . . three critical post-conviction eyewitnesses who provided testimony that Caldwell was not the shotgun shooter and was not involved in the Acosta murder" indicates the judge did not consider their testimony. Caldwell also contends the trial court limited itself to considering the state of the evidence as it existed at earlier times, such as his 1991 trial or his 2009 habeas petition, rather than the evidence as it existed at the time of his factual innocence motion.

These arguments are not supported by the record. As the People demonstrate, the trial court explicitly referred to "the evidence now presented" and Caldwell's "new evidence in the form of declarations and depositions related to his federal civil rights action and his action for compensation for unlawful incarceration." The court stated that it looked "at portions of the trial transcript, declarations supporting the 2009 petition for writ of habeas corpus, and declarations recently obtained from [Caldwell's] civil cases" and that it "thoroughly reviewed the materials presented by both sides," including "the new evidence presented by Petitioner." Twice the court referenced the "preponderance

of the evidence" standard, in both setting forth and applying the burden of proof under section 1485.55.

Given the court's express statements to the contrary, as well as the detailed nature of the order and its factual findings, we find no support for Caldwell's contention that the trial court implicitly ignored or discounted certain evidence or applied an incorrect burden of proof in deciding his motion.

## B. Substantive determination

Nor has Caldwell met his burden to show that the trial court erred by denying his motion on its merits. "[I]f the court grants a writ of habeas corpus and did not find the person factually innocent in the habeas corpus proceedings, the petitioner may move for a finding of factual innocence by a preponderance of the evidence that the crime with which he or she was charged was either not committed at all or, if committed, was not committed by him or her." (§ 1485.55, subd. (b).) "Preponderance of the evidence" means that "the evidence on one side outweighs, preponderates over, is more than, the evidence on the other side, not necessarily in number of witnesses or quantity, but in its effect on those to whom it is addressed." (*People v. Miller* (1916) 171 Cal. 649, 652.) The question in claims of factual innocence " 'is not whether there is sufficient evidence to establish culpability, but whether or not claimants can establish they are not culpable.' " (*Tennison v. California Victim Comp. & Government Claims Bd.* (2007) 152 Cal.App.4th 1164, 1191.) Thus, to obtain relief under section 1485.55, Caldwell had to prove by a preponderance of the evidence that he did not commit the crimes with which he was charged.

Our independent review of the record confirms the trial court's conclusion that Caldwell did not satisfy his burden. As Caldwell notes, the main dispute is whether he was the shotgun shooter. Caldwell maintains that a preponderance of the evidence shows that Martin, not he, was the shotgun shooter.[10] We disagree.

---

[10] Contrary to habeas counsel's prediction that Martin would exonerate Caldwell, Martin declared, "I did not shoot the shotgun or any other gun at any person during this incident." Martin denies ever having offered to state that he was the shooter, and states

19

At oral argument, Caldwell contended that "you have eleven independent witnesses who all say Maurice Caldwell was not there when the shooting occurred." "You have five eyewitnesses to the shooting who say that the shooters were Marritte Funches (sic) shot the handgun and Henry Martin shot the shotgun."

Among the five eyewitnesses, counsel counts Caldwell. During his initial police interviews, Caldwell adamantly asserted that he arrived on scene after the last shots were fired. In his declaration supporting his 2009 habeas petition, Caldwell declared that, upon arriving at the scene of the shooting, "I saw Henry Martin standing at the corner of the 947 Ellsworth Street building in which Mary Cobbs lived, firing a shotgun. I could not see what he was shooting at. I saw him fire one shot and then take off running down Ellsworth Street." Yet, in his 2013 declaration supporting his section 4900 petition, Caldwell stated only, "I saw Henry Martin running away with a shotgun." Asked about the discrepancy during his 2015 federal case deposition, Caldwell acknowledged that the statement in his 2009 declaration was false and that he did not see Martin shoot the shotgun. Caldwell's contradictory statements about his presence and Martin's role support the trial court's implicit finding that Caldwell's testimony was not credible.

The record includes statements from Funches, Marcus Mendez, Maurice Tolliver and Demitrius Jones—presumably the other four eyewitnesses referenced by counsel. Mendez states he saw Caldwell run towards the group after the shots were fired and he was not holding a gun. Mendez does not identify Martin as the shotgun shooter. Tolliver and Jones do state that Martin fired the shotgun. But counsel omits the following critical sentence from Tolliver's declaration: "As the guys in the car were trying to do a u-turn (sic) to get out of there, *Henry [Martin] passed the gun that he had been firing to a taller guy* who went toward the corner of the building by Ellsworth and *shot at the car some more as they were trying to leave*." (Italics added.) There is no conflict between the "eyewitness" declarations about Martin's role and Cobbs's testimony that she saw

Caldwell attempted to induce Martin's admission that he was the shotgun shooter with a bribe: "Maurice Caldwell contacted me after he was released from prison and offered me money if I would testify that he was not the shooter."

20

Caldwell firing the shotgun. Mendez saw Caldwell running toward the scene without the shotgun. Jones saw Martin fire the shotgun. Tolliver saw Martin fire and then hand the shotgun to a second shooter who "shot at the car some more as they were trying to leave." That Caldwell was the second shooter seen by Tolliver and identified by Cobbs resolves any discrepancy on which Caldwell relies. And, contrary to habeas counsel's statement, Cobbs's description of the vantage point from which she observed Caldwell is consistent with her testimony.

The post-conviction evidence does not refute compelling evidence that Caldwell was the shotgun shooter. In her initial interview with Gerrans, Cobbs provided a detailed physical description of the shotgun shooter that matched Caldwell's appearance. Cobbs also identified Caldwell as the shotgun shooter in subsequent lineups, and she unequivocally identified Caldwell as the shotgun shooter during trial. Both Cobbs and Martin testified that the shotgun shooter was not wearing a shirt at the time of the shooting. Cobbs was consistent from her initial recorded interview when she said: "And there was one that was holding the gun . . . looked like a shotgun to me. And he didn't have no shirt on." Martin also noted this detail about the shotgun shooter, declaring: "I observed this other person fire the shotgun at least 2-3 times at the car as [it] tried to drive away. The shooter was not wearing a shirt. He was bare back." Cobbs repeated this detail at trial, connecting it specifically to Caldwell: "He didn't have no shirt on." Caldwell's alibi witnesses, Rodriguez and Williams, corroborated Cobbs's testimony on this point, telling investigating officers that "Caldwell ran outside toward the shooting and . . . that he had no shirt on." Caldwell's initial alibi was that he was in an upstairs bedroom of Rodriguez's home at the time of the shooting and that he left the home only after all shots had been fired. Caldwell contradicted that statement when he said he saw Martin with the shotgun, then that Martin shot the gun, and ultimately admitted to the falsity of those accusations. While contradictory in some respects, all his post-trial testimony places him at the scene of the crime when the shots were being fired.

Caldwell's innocence claim is further belied by evidence of his effort to intimidate Cobbs to prevent her from cooperating with the investigation into the incident and

21

testifying.  Cobbs testified at trial that Caldwell himself directly threatened her, after the shooting:  "He told me, if I talked, they were going to fuck me and my family up."  She also testified that associates of Caldwell had made similar threats, earlier the same day, to "kill" her and her family if she kept "talking to the police."  Funches confirmed that a note was delivered to Cobbs warning her to stop talking to police about the incident.  Funches also confirmed that Cobbs's cooperation with police against Caldwell might have been reason, based on his mentality at that time, to kill Cobbs.  In a memorandum, Caldwell's habeas attorneys noted that Funches told them he was involved in a plan to kill Cobbs and that, though Caldwell "did not know the specifics, he knew that [Funches] would do whatever it took."

After reciting the evidence he reviewed, the trial court concluded:  "These examples are only a fraction of the inconsistent declarations and testimony presented over the 25-plus year history of this case."

The evidence supporting Caldwell's contention that he was not the shotgun shooter is eclipsed by the evidence of his role in the murder.  Caldwell did not prove his innocence by a preponderance of the evidence.

## DISPOSITION

The order denying Caldwell's factual innocence motion is affirmed.

22

_____

Ross, J.[*]

We concur:

_____

Siggins, P.J.

_____

Jenkins, J.

A148828

_____

[*] Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

People v. Caldwell

(A148828)


Trial court:          City & County of San Francisco


Trial Judge:          Hon. Charles F. Haines


Attorneys:            Gross Belsky Alonso, Terry Gross, Adam C. Belsky, and Monique
                      Alonso for Defendant and Appellant.

                      Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant
                      Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney
                      General, Barton Bowers, Acting Supervising Deputy Attorneys
                      General, Sharon E. Loughner, Deputy Attorney General for
                      Respondent.